James A. MOTLEY, Plaintiff,

v.

TRACTOR SUPPLY COMPANY, Defendant.

No. IP 95–0308–C M/S.

United States District Court, S.D. Indiana, Indianapolis Division.

July 23, 1998.

2. The further conditions of Defendant's sentence are set forth in the judgment order.

Kenneth Collier–Magar, Collier–Magar, Indianapolis, IN, for plaintiff.

Charles W. Pautsch, Joseph Gumina, Wessels & Pautsch, Milwaukee, WI, for defendant.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

McKINNEY, District Judge.

This matter is before the Court on a motion filed March 2, 1998, by the defendant, Tractor Supply Company ("TSC"), seeking summary judgment in its favor on all claims raised in the complaint. TSC argues that the plaintiff, James A. Motley ("Motley"), has failed to present sufficient evidence to show that he was subjected to a hostile work environment because of his race, or that he was retaliated against for filing a charge of discrimination, or that he was terminated for a discriminatory reason. Motley filed his initial complaint in state court on February 13, 1995, but it was removed to this Court on March 8, 1995, after which an amended com-

plaint was filed on July 23, 1996. In it, Motley alleges that his former employer, TSC, discriminated against him because of his race and in retaliation for filing a charge of discrimination with the Indiana Civil Rights Commission ("ICRC"), all of which violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended ("Title VII").

In response, TSC filed a counterclaim against Motley charging him with presenting false claims, in bad faith, because of his own racial animus, and with conspiring to deprive others of equal protection of the laws. Specifically, defendant alleges that Motley maliciously ridiculed and harassed other TSC employees, and threatened them with physical harm. Relying on 42 U.S.C. § 1985(3) for its counter-complaint, TSC seeks money damages and injunctive relief.

TSC's counter-claim issues are not included in the pending summary judgment motion, and will not be addressed at this time. The March 1998 motion for summary judgment is the second such motion filed by the defendant, the first having been withdrawn after the Seventh Circuit's ruling in *Pryner v. Tractor Supply Co.,* 109 F.3d 354 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 294, 139 L.Ed.2d 227 (1997).[1] Both sides have thoroughly presented their positions with respect to the merits of the Title VII claims, as well as their supporting evidence, and the Court is now prepared to rule on the motion. For the reasons given below, defendant TSC's motion for summary judgment is **GRANTED, in part, and DENIED, in part.**

## I. FACTUAL BACKGROUND

James A. Motley, an African–American resident of Indianapolis, began working for TSC, a national retailer of home, farm and auto supplies, in May of 1990. Motley Aff. ¶ 2. Initially he worked as a janitor in TSC's Indianapolis distribution center ("Distribution Center"), but he subsequently became a warehouse associate, or "picker." *Id.* ¶ 3. A picker's job involved separating the merchandise delivered by truck to the Distribution Center, for subsequent delivery to TSC's various retail store outlets in several states. *Id.* After a ninety-day probationary period, Motley became a member of the collective bargaining unit at the Distribution Center in August 1990, and as such he was covered by the terms and conditions of a collective bargaining agreement ("CBA") between TSC and the Chauffeurs, Teamsters, Warehousemen and Helpers Local Union No. 135 (the "Union"). Def's Ex. A, Paxton's First Aff., Exs. 2, 3 ("Paxton I Aff."). He was classified as a "25%" worker, which meant that he would be assigned at various times to different areas and supervisors. Motley Dep. Dated October 24, 1994, at 225 ("ICRC Dep.").

According to Distribution Center manager, Lloyd Paxton ("Paxton"), the CBA between the Union and TSC had successive three year terms during the time Motley worked for the defendant: one from April 30, 1990, to April 30, 1993, and a second from April 30, 1993, to April 30, 1996. Paxton I Aff.Ex. 2, 3. It included provisions that prohibited discrimination by either the Union or the employer on the basis of, among other things, race, color or national origin, as well as a clause agreeing that all disputes "involving interpretation or application of the provisions of" the CBA would be subject to binding arbitration. *Id.* Contract negotiations during the relevant periods were often marked by labor unrest. Motley Dep. Dated September 14, 1995, at 157 ("Fed.Dep."); Paxton I Aff. ¶ 8. Unidentified employees engaged in vandalism, dissemination of anti-management literature, and various other visual displays of union members' displeasure. Motley witnessed this type of activity when he first started working at TSC, and again during 1993. Fed.Dep. at 157. It appears that during labor negotiations the workplace became unpleasant and tense at times.

---

1. Defendant argued in its initial summary judgment motion that the matters in dispute between Motley and itself were subject to an enforceable provision in the collective bargaining agreement between TSC and its employees' union to arbitrate all disputes relating to that agreement. In *Pryner,* the Seventh Circuit affirmed the district court's ruling that the arbitration clause of a collective bargaining agreement does not rob individual employees of the right to enforce their statutory rights in court, unless the worker has individually consented to arbitrate the dispute. *Pryner,* 109 F.3d at 363. Motley did not individually assent to arbitration of his civil rights claims.

However, Motley claims the workplace was even more unpleasant for him. He claims to have been harassed because of his race during the course of his employment and accuses a white co-worker, Keith Bland ("Bland"), of harassing him from the beginning of his employment at TSC. Motley Aff. ¶ 6. The only incident Motley specifically described occurred within a month of the time Motley began at TSC, in May 1990. ICRC Dep. at 98–99. Bland allegedly told Motley that Bland had not "kicked a nigger's ass in a long time." *Id.* Motley complained right away to the manager of the Distribution Center, Steve Lippman, who told him he could do nothing about it because Motley was still a probationary employee. Motley Aff. ¶ 4. According to Motley, the Union's representative told him the same thing. *Id.* Bland allegedly "continued to harass Motley" by using racial slurs and threats, which ultimately led to a physical confrontation between the two on June 13, 1995. Motley stated that these incidents "would be reported to my immediate supervisor and at no time was any action taken against Bland" till the June 1995 incident. Motley Aff. ¶ 6. Both Bland and Motley were given a three-day suspension for this incident, Bland for using racially derogatory language, Motley for physically threatening Bland, and both of them for fighting. *Id.*, Ex. A, B. Motley has presented no corroborating evidence from anyone who may have witnessed Bland's earlier behavior.

Another person who allegedly harassed Motley was MacKendall Pompey ("Pompey"), an African–American who was promoted to a supervisory position at the Distribution Center in 1991. ICRC Dep. at 212; Paxton's Second Aff. ¶ 2 ("Paxton II Aff."). According to Motley, once Pompey was promoted "the racist came out of" him. ICRC Dep. at 150. Pompey allegedly referred to Motley as "boy" and "poor trash," and once he called him a "stupid nigger." ICRC Dep. at 68, 220. The latter incident occurred in April of 1993, after Motley had filed a grievance and a charge of discrimination naming another

supervisor, Lisa Ooley ("Ooley"), as one who had harassed him. *Id.*

Motley complained that Ooley, who became a supervisor in February of 1993, harassed him because of Pompey's instructions to do so. ICRC Dep. at 212; Fed.Dep. at 239. Ooley never used any racial slurs or made any racial comments to Motley. ICRC Dep. at 212. Neither Pompey nor Ooley were ever direct supervisors of Motley's, and Ooley had no control over the terms and conditions of his employment. *Id.* at 214–15, 224. Yet, according to Motley, Ooley and Pompey both would comment on his performance and instruct him to stop talking, or get to work, or get back to his area, or criticize his picking. ICRC Dep. at 212–15, 224–26; Fed. Dep. at 82–83. Motley complained to his union steward about these incidents of alleged harassment, but not to management. ICRC Dep. at 154.

According to Motley, he also subjected to racial slurs or harassment by Mike Kerulis ("Kerulis"), another management employee. ICRC Dep. at 235. Kerulis was responsible for assigning Motley to a shift upon his return from a leave in November of 1993. *Id.* Having bid on the shift he had previously been working, Motley was surprised and upset to learn he was assigned to a different shift. *Id.* When he asked Kerulis about it, Kerulis allegedly stated "I can't keep you two niggers on the same shift," meaning Motley and co-worker Vince Pryner ("Pryner").[2] *Id.* At one other time after Motley returned from his leave and prior to his discharge, Kerulis reportedly used this same racial slur with reference to Motley. According to Jerry Bonebrake ("Bonebrake"), another co-worker of Motley's, Kerulis said he was going to "have to get rid of that nigger." Bonebrake Dep. at 60.

Another person allegedly using racial slurs and discriminating against Motley was Larry Goldberg ("Goldberg"), a TSC corporate vice-president. Motley Aff. ¶ 17. According to Motley, more than once Goldberg tried to

**2.** Pryner was an African–American warehouse associate who also claimed to be a victim of racial harassment and discrimination at TSC. Like Motley, he had filed grievances and charges of discrimination by the time of Kerulis's alleged

comment. The relevant facts of Pryner's case against TSC are documented in *Pryner v. Tractor Supply Company*, 927 F.Supp. 1140 (S.D.Ind. 1996), *aff'd* 109 F.3d 354, *cert. denied*, —— U.S. ——, 118 S.Ct. 295, 139 L.Ed.2d 227 (1997).

"bribe" him to drop the ICRC action by asking him how he would like to make $73,-000.00 a year as a plant manager in Omaha. Fed.Dep. at 133. This occurred approximately in late 1993 or early 1994. *Id.* at 133. Motley asked Goldberg, "is it guaranteed?" and Goldberg replied, "Nothing's guaranteed." *Id.* Motley then said, "Well, hell, I don't want it then." *Id.* After that comment, Goldberg allegedly said, "That's the problem with your black ass ... Can't do nothing for you." Fed.Dep. at 133–34. A subsequent exchange between the two, at an unspecified time, allegedly involved Goldberg's use of the word "nigger," which Motley said he reported to Paxton. Fed.Dep. at 134. The incident is not mentioned in either of Paxton's affidavits, and no deposition testimony was provided from Paxton.

Nevertheless, other TSC workers reported having heard a supervisor using a racial slur. According to co-worker Sandra Dugger ("Dugger"), supervisor Ray Kilbarger ("Kilbarger") used the word "nigger," but not in connection with any specific employee at TSC. Dugger Dep. at 11, 30. Dugger began working at TSC on February 25, 1993, and her deposition was taken on December 1, 1995. Dugger Dep. at 6. Although Dugger does not say exactly when she overheard Kilbarger use this word, it appears that she was testifying about events that occurred after Motley filed his charge of discrimination. She also stated that once while she was walking past supervisor Ron Diedring ("Diedring"), she overheard him say something "about blacks being so much trouble and wondering why, you know, everybody wasn't getting along." Dugger Dep. at 14–16. Diedring did not mention any particular employees, and Dugger could not recall many details of the incident, or when it occurred. *Id.* at 16–17. This was the only time she heard Diedring make any comments about black people. *Id.* According to Dugger, Diedring was not at TSC for very long and these comments were made shortly before he quit. Dugger Dep. at 14–15.

Bonebrake reported overhearing Pompey calling Motley and Pryner "niggers," and Kerulis referring to Motley in the same manner. Bonebrake Dep. at 11–12, 60. At first, Bonebrake placed these incidents as happening in the summertime, "about three years ago." His deposition was in December of 1995. Bonebrake Dep. at 11. From the context, however, it is more likely he was referring to the summer of 1993. *Id.* at 11–12. He recalled hearing the two "talking about this lawsuit." *Id.* at 12. Thus, the discussion must have occurred after Motley had filed his charge with the ICRC.

Finally, Terry Kimble ("Kimble"), another co-worker, testified that Pompey called Motley and Pryner "niggers" a "couple of times on different occasions." Kimble Dep. at 29–30, 32. He described one incident that seems to have happened in 1993, after TSC filled its newly-created "lead positions" and the lead employees were functioning in their new positions. *Id.* at 29. The second incident was described as occurring not too long before Pryner left TSC, which was also after April of 1993. *Id.*

In early 1993, at the time TSC and the Union were negotiating a CBA for the next term, management and employee relations became strained at the Distribution Center. Def's Ex. A, Paxton I Aff. ¶ 8; Ex. B, Penny Aff. ¶ 3. Sometime during that period, unknown persons engaged in anti-company activities, which included damaging warehouse equipment and merchandise, disseminating anti-management literature, creating anti-company graffiti, and stringing a rope from the ceiling that looked like a hangman's noose. Penny Aff. ¶ 3. Motley's supervisor at the time, Ory Penny ("Penny"), stated that the rope incident was "generally understood to be an act against management" and not a racial incident. *Id.* Penny is African–American. *Id.* ¶ 1. Motley, however, interpreted it as an act of racial animosity.[3] ICRC Dep. at 207–211. The rope was removed as soon as Penny saw it, and he recalls no similar rope incidents during the rest of the time he

---

**3.** The number of ropes and rope incidents are also at issue, with Penny stating that it only occurred once, during the time of labor contract negotiations, and Motley testifying to multiple incidents at unspecified times, with numerous ropes strung up at one time. *See* Motley Sept. 14, 1995, Dep. at 156–57, 198–99. Motley said in his affidavit that on "several occasions" ropes were made into hangman's nooses and displayed on the beams of the warehouse. Motley Aff. ¶ 15.

worked at TSC, which was until July 1993. *Id.* ¶¶ 2, 3. Despite his thorough investigation, Penny could not determine who had been responsible for this display. *Id.* Motley, on the other hand, recalls that the ropes were frequently displayed in a hangman's noose fashion. Fed.Dep. at 156–57, 198–99. He also recalls two of his co-workers coming up to him at some unspecified time, but when the ropes were on display, and asking if a black man was getting hung. ICRC Dep. at 210.

Along with the display of hangman's nooses, and alleged racial slurs and harassment just described, Motley claims that the environment at TSC was made hostile by other racial incidents. Among those is one that occurred in 1991, in which someone scratched the word "nigger" into the paint on Motley's car while it was parked in TSC's parking lot. ICRC Dep. at 202–03; Motley Aff. ¶ 14. Motley did not say whether he reported this incident to anyone, but indicated he did not file a charge of discrimination in 1990–91 because the incidents were not that bad, and he did not think anyone would do anything about it. ICRC Dep. at 203. In addition, he stated that he did not know an employee could file against his company, so he decided that if anyone else touched his car, he would take matters into his own hands. *Id.*

Finally, in 1993 during the contract negotiations, Motley's time card and production time sheet were allegedly written on by someone. Bonebrake reported the incident to Motley, who states that he did not actually see the writing. Bonebrake told Motley that someone had written something about doing something to Motley on the time card, and a similar message appeared on Motley's production sheet a few days later. ICRC Dep. at 202; Motley Aff. ¶ 14. Penny investigated the incident but he was unable to learn who was responsible. Motley Aff. ¶ 16; Paxton I Aff. ¶ 9; Penny Aff. ¶ 4. Even though Motley did not see the time card or know if the writing involved any racial slurs, he interpreted the event as having to do with his

race.[4] Bonebrake did not say whether the writing contained any racial slurs. ICRC Dep. at 202.

After this event, Motley filed his first grievance with the union complaining about the alleged racial harassment he had endured at TSC.[5] Paxton I Aff., Ex. 1(a), Motley April 19, 1993, Grievance; Fed.Dep. at 225. The grievance stated "I had nigger wrote on my jeep and dumb black ass wrote on my time card and dumb black ass on my work sheet." *Id.* Although he had just reported this incident to his immediate supervisor, Penny, Motley indicated in the grievance that no one in management did anything about it. *Id.*; Fed.Dep. at 225. Also included in the grievance were allegations about the May 1990 incident with Bland; about Pompey targeting him for harassment and saying that he was going to get rid of either Motley or Pryner; and about Ooley singling him out and telling him to get to work while ignoring white workers' inactivity. Paxton I Aff., Ex. 1(a), Motley April 19, 1993, Grievance.

The Union asked management for, and was given, time to investigate the alleged discrimination and harassment, but before it could complete the investigation Motley filed his charge with the ICRC. Paxton I Aff. ¶ 9. In that charge, Motley said that he had been employed by TSC since May 1990, and during that time he had been subjected to a racially hostile environment. Paxton I Aff., Ex. 1(b), Motley April 26, 1993, Charge with ICRC. For example, he reported that "racial slurs have been written on my time card, most recently in April 1993 . . . . Racial slurs have been written on my car and lynching ropes have been hung from the warehouse ceiling." *Id.* In addition, Motley complained that supervisors Pompey and Ooley "harass me on a daily basis by making my job more difficult. Pompei [sic] refers to me as 'nigger' and 'boy,' and has stated to me and another black employee that he is going to get rid of us 'niggers.' [Ooley] constantly criticizes me for minor things, but does not

---

4. When asked if the writing involved any racial slurs, Motley said, "I don't know, I didn't see it." ICRC Dep. at 202. He said that Bonebrake did not say it involved racial slurs, "it just said something about getting you or something." *Id.*

5. In addition to this method of dealing with his alleged claim, Motley could have taken advantage of TSC's "Open Door Policy," which allows any employee access to any member of management about any issues, problems or concerns. Paxton I Aff. ¶ 15, Ex. 4.

treat similarly situated whites in the same manner." *Id.* He also stated his belief that he had been discriminated against based on his race and that management was aware of the racially hostile environment and had failed to remedy it.[6] *Id.*

Management claims not to have known of the alleged treatment Motley received from Pompey until he filed his grievance and charge in late April 1993, after which vice-president Goldberg gave Motley his direct telephone number. Fed.Dep. at 135–37, 409. Goldberg, who told Motley to call him if Pompey "keeps harassing you or calling you the N word," indicated he would not tolerate such conduct. *Id* . Although Motley had already filed his charge with the ICRC by the time Goldberg spoke with him, he did not tell Goldberg, who was unaware of the charge. *Id.* at 419. When Goldberg learned that Motley had filed a charge, he was upset and told Motley that he had not given management a chance to fix the problem. *Id.* Subsequently, Goldberg told Motley that he was bright and could have a future at TSC if he would follow in Pompey's footsteps. Motley Aff. ¶ 17. Motley reported he understood this to mean that if he would hassle and discriminate against other blacks, he could be a supervisor. *Id.*

Nevertheless, Goldberg offered Motley a chance at a job in Omaha as a plant manager, with a significant increase in pay. Fed.Dep. at 133–35. Motley refused to take the chance. *Id.* According to Motley, Goldberg, Jerry Newkirk, who is one of the owners of TSC ("Newkirk"), Pompey and Penny were "looking for black supervisors." Motley Aff. ¶ 10; Fed.Dep. at 319. Pompey allegedly told Motley that if he wanted to become a supervisor he would have to follow in Pompey's footsteps. Fed.Dep. at 319. All of

these statements were taken by Motley as bribes to get him to drop his discrimination complaint, although none of the testimony specifically linked the possibility of a management position with Motley dropping the ICRC action.

Motley also considered Pompey and Goldberg's statements as retaliation and harassment for his having filed a charge. He testified that he was subjected to additional harassment by Pompey, Ooley and Kerulis about "minor matters" after the charge, and that he was not allowed to return to his former shift. Motley Aff. ¶¶ 13, 17. Goldberg, who Motley states "was aware of this increased pattern of racial discrimination," had taken Pompey "under his wing and made him invulnerable to any complaints that [Motley] would make." *Id.* ¶ 17.

When this perceived harassment and retaliatory conduct became too much for him, Motley took a "stress leave" beginning May 21, 1993. Motley Aff. ¶ 18. He was on leave from May 21 until November 30, 1993, at which time he returned and was told by Kerulis that he would be placed on a different shift than he had requested, and away from Pryner.[7] ICRC Dep. at 235; Motley Aff. ¶ 19. Motley claims that he reported this comment to supervisor Diedring, who stated that he would talk to Kerulis. Motley Aff. ¶ 19. Nevertheless, Motley felt that the conditions of his work environment unchanged or worse when he returned from leave, which led to his taking another stress leave in 1994. Motley Aff. ¶ 20. Upon return from the second stress leave, in October 1994, Motley began to be followed around the warehouse by three supervisors, which Motley perceived as harassing conduct. *Id.* In particular, Pompey would drive up to Motley

---

**6.** A subsequent charge was filed on May 10, 1993, in which Motley claims retaliation on May 5, 1993, when he received a written reprimand for his attendance problem, and verbal harassment for filing his charge. Paxton I Aff., Ex. 1(c). He claimed that he had been reprimanded for missing the same amount of time that other employees were allowed to miss, and that the reprimand was in close proximity to the filing of his charge. *Id.*

**7.** In Motley's affidavit he states that this incident occurred in July 1993, when he returned from his stress leave. The Court notes, however, that

Motley's brief states that he took ten months of leave in 1993, and approximately three months in 1994. Plf's Brf. in Oppos. at 9. By evidence filed with Motley's response to the second summary judgment motion, it is clear that Motley took a little more than six months' leave in 1993. *See* Pl's Ex. J and L, filed 3/30/98, Absentee Calendars for 1994 and 1993, respectively. Specifically, Motley was out from May 21 to November 29, 1993 (more than six months), from July 29 to October 27, 1994 (approximately three months), and another five weeks for military duty in 1994. *Id.* This evidence is uncontested.

in his golf cart and watch him until Motley noticed, then drive off. *Id.*

Despite all of this treatment, Motley continued to perform his job as well as he could, which was evaluated in May 1995 as ranging from good to "highly effective." Motley Aff. ¶ 24, Ex. E. In December 1994, Motley received a certificate of achievement for performance above the standards set for his position, and another one in March 1995. *Id.* No evidence was presented regarding whether giving such awards was a recent, or a long-standing practice. Offsetting the quality of Motley's work performance, however, was his irregular attendance.

Motley claims that, "as a result of the continuing racial harassment and hostile work environment," he began to have attendance problems, including absences, tardies, and early departures. Motley Aff. ¶ 25. TSC had a written attendance policy that allowed employees three excused absences in a calendar year, and then began charging them with a fourth absence or more. Paxton I Aff., Ex. 2, 1993–1996 CBA, Attendance Policy. The policy also says, "This attendance policy is an annual policy, meaning that it is effective for each calendar year and that only chargeable offenses exceeding 4 in number will be carried over to the following year one year from the offense." A similar system was employed for tardies and early departures. When an employee reached the fourth absence, he or she would be given a verbal warning, a fifth absence yielded a written warning, a sixth, a three-day suspension, and a seventh would result in discharge. *Id.*

On July 13, 1995, Motley arrived at work late due to a meeting with his attorney, but his wife had called in to notify his supervisor that he would be late. Motley Aff. ¶ 25. At that time, he had six chargeable tardies and six chargeable absences carried over from the prior year, and he had used up his free absences. Ooley Aff. ¶ 8. He had been absent January 6, 10, 27, March 2, April 19, November 4, of 1994, for a total of six absences during calendar year 1994. These absences placed him at the sixth penalty level until one year after the sixth absence had occurred, or November 4, 1995. *Id.* In 1995, Motley used his three free absences on January 9, 17, and February 2, 1995. The

July 13, 1995, absence (or tardy) was his seventh absence (or tardy), and he was terminated that day. Motley Aff. ¶ 25, Ex. H. Ooley was responsible for maintaining the attendance records for TSC warehouse associates at all relevant times, and she informed TSC supervisor Paxton of Motley's seventh absence. Ooley Aff. ¶ 8. Motley's "Corrective Action Report," in which his termination was recorded, was signed by Jim Lippold, but Motley did not sign it or make any comments. Motley Aff., Ex. H.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *Id.*

The moving party has the initial burden to show the absence of genuine issues of material fact. *See Schroeder v. Barth*, 969 F.2d 421, 423 (7th Cir.1992). This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof. *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n. 3 (7th Cir.1994). The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Scherer v. Rockwell Int'l Corp.*, 975 F.2d 356, 360 (7th Cir.1992). The opposing party must "go beyond the pleadings" and set forth specific facts to show that a genuine issue exists. *See Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1261 (7th Cir.1993), *cert. denied*, 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994). This burden cannot be met with conclusory statements or specu-

lation, *see Weihaupt v. American Med. Ass'n*, 874 F.2d 419, 428 (7th Cir.1989), but only with appropriate citations to relevant admissible evidence. *See* Local Rule 56.1; *Brasic v. Heinemann's Inc., Bakeries*, 121 F.3d 281, 286 (7th Cir.1997); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923–24 (7th Cir.1994). Evidence sufficient to support every essential element of the claims on which the opposing party bears the burden of proof must be cited. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a summary judgment motion, a court must draw all reasonable inferences "in the light most favorable" to the opposing party. *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir.1992). If a reasonable factfinder could find for the opposing party, then summary judgment is inappropriate. *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992). When the standard embraced in Rule 56(c) is met, summary judgment is mandatory. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Shields Enters.*, 975 F.2d at 1294.

### B. Discriminatory Discharge

No direct evidence has been presented to support a finding that Motley was discharged based on his race or in retaliation for filing a charge of discrimination. Therefore, he can prevail only by utilizing the indirect method of proof first articulated in *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Dept. of Community Aff. v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Although this framework was originally applied only to Title VII claims, it has been adapted to retaliation claims. *See Rennie v. Dalton*, 3 F.3d 1100, 1108–09 (7th Cir.1993), *cert. denied*, 510 U.S. 1111, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994).

■ Under this analytical framework, the plaintiff initially must introduce sufficient evidence that, if believed or undisputed, would support a prima facie case of discrimination or retaliation. *Hicks*, 113 S.Ct. at 2746–47;

*Rennie*, 3 F.3d at 1108–09. To establish a prima facie case of discrimination under Title VII, a plaintiff must prove the following:

1. membership in a protected group;
2. satisfactory job performance;
3. adverse employment action; and
4. more favorable treatment of "similarly situated" employees outside the protected group.

*Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir.1994); *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1133 (7th Cir.1994); *Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1261 (7th Cir.1993), *cert. denied*, 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994).

■ The elements of a prima facie case establishing retaliation require a showing that:

1. plaintiff engaged in a legally protected activity;
2. employer subsequently took adverse employment action against plaintiff; and
3. employment action was *caused* by plaintiff's participation in protected activity (called by courts the "causal link").

*Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir.1991); *Lloyd v. Bridgeport Brass Corp.*, 811 F.Supp. 401, 407 (S.D.Ind.1993). The first element of a retaliation claim, however, is modified by the condition that for plaintiffs to have engaged in a protected activity, they must have reasonably believed in good faith that the practice they opposed violated Title VII. *Alexander v. Gerhardt Enters., Inc.*, 40 F.3d 187, 195 (7th Cir.1994).

■ Once the employee makes a showing sufficient to prove a prima facie case he or she will enjoy a rebuttable presumption of discrimination that shifts the burden of production to the employer to "articulate a legitimate, nondiscriminatory reason" for the adverse employment action.[8] *Anderson*, 13 F.3d at 1122. The employer does so by producing evidence, whether or not persuasive, of a nondiscriminatory reason. *Hicks*,

---

8. The *McDonnell–Douglas* presumption is only a "procedural device" intended to establish an order of proof and production, not a means of deciding the merits. *Hicks*, 113 S.Ct. at 2755.

113 S.Ct. at 2747 (noting that the plaintiff retains the ultimate burden of persuasion on the issue of intentional discrimination).

■ If the employer succeeds in this task, the presumption dissolves and the burden of production shifts back to the plaintiff "to show that the employer's proffered reasons are a pretext for ... discrimination" or retaliation. *Anderson,* 13 F.3d at 1122 (citing *Weihaupt,* 874 F.2d at 426–27); *Lloyd,* 811 F.Supp. at 405. The plaintiff can prove pretext by showing that, 1) the employer's stated reason has no basis in fact; 2) although based on fact, the stated reason was not the *real* reason; or 3) the stated reason was insufficient to warrant the adverse employment action. *Hughes,* 20 F.3d at 747; *Samuelson v. Durkee/French/Airwick,* 976 F.2d 1111, 1114 (7th Cir.1992); *Lloyd,* 811 F.Supp. at 405.

■ However, at the summary judgment stage, a plaintiff must produce evidence sufficient for a rationale fact-finder to infer that the employer *lied* about its proffered reasons. *Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir.1995) (pretext does not mean mistake, "[i]t means a lie, specifically a phony reason for some action."); *Schultz v. General Elec. Cap. Corp.,* 37 F.3d 329, 334 (7th Cir.1994), *cert. denied,* 515 U.S. 1145, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995). It is not enough to show that the employer was mistaken, or that others disagree. "There is a fine line between evidence that appropriately challenges the employer's proffered reasons as being unworthy of credence and evidence that merely shows that the employer made a mistake or a bad business judgment." *Schultz,* 37 F.3d at 334 (quoting *Kralman v. Illinois Dep't of Vet. Aff.,* 23 F.3d 150, 156 (7th Cir.1994)). Unless there is some showing of discriminatory motive, courts do not question an employer's good faith business decisions. *Id.*

■ There are two actions that Motley identifies as adverse employment actions: the harassment and his discharge. He also suggests two unlawful motives for each action: discrimination on the basis of race, and

retaliation for filing a charge of discrimination. Having reviewed all of the evidence regarding Motley's discharge, the Court finds that insufficient evidence was presented to create a genuine issue about either motive he suggested for that employment action. Under the race discrimination theory, Motley's evidence would not allow a rational jury to find that he had been performing his job satisfactorily, or that similarly-situated employees not of his race received more favorable treatment. Instead, the evidence shows that TSC discharged him based on his violation of its written attendance policy, that is, he was absent or tardy for the seventh time within a year.

Motley does not dispute any of the recorded absences or tardies, or the existence of an attendance policy, or the fact that the written attendance policy was distributed to all TSC employees. Rather, he disagrees with how TSC applied its attendance policy in his case. According to Motley, TSC should only count chargeable absences or tardies for the twelve month period immediately preceding the date in question. For instance, he was absent (or tardy) on July 13, 1995, which means under his interpretation that the "look back" period would be from July 14, 1994, to July 13, 1995. During that period the number of chargeable absences Motley counted was two (November 4, 1994 and July 13, 1995), and the number of tardies was five. Consequently, Motley argues that he should not have received discipline for a seventh absence on July 13, 1995, but only for a fourth absence occurring in that one-year period.[9] The Court does not agree.

TSC's attendance policy stated it was administered on a calendar year basis, meaning that the number of chargeable absences (exceeding four) accumulated during one calendar year would be carried over to the next. The only limitation on that system was that carried-over chargeable absences are forgiven one year after the last offense in the previous calendar year. Thus, if an employee reaches a certain penalty level in one calendar year, such as six absences (for

---

9. Each year Motley received three "free absences," for which he is not charged until he incurs a fourth absence, at which time any carryover absences from the previous calendar year

are added to the sum of the free absences and chargeable absences in the current year. Ooley Aff. ¶¶ 4–6.

which he would be suspended for three days), he will stay at that level until one year after he incurred that sixth absence. Ooley Aff. ¶¶ 4–6; Paxton I Aff.Ex. 2, CBA for 1993–1996, Attendance Policy. This is both a reasonable interpretation of the written attendance policy, and the interpretation actually used by TSC. *Id.*

With Motley's interpretation of the policy, chargeable absences would be dropped from the count one year after each one occurred, in effect making it a rolling twelve-month, rather than a calendar year, policy. For example, if in the previous year a sixth chargeable absence was recorded in November and the fifth chargeable absence had occurred in June, then in July of the current year the fifth absence would have dropped off, and the employee would have only one chargeable absence on his record (the November one). If this method were used, an employee would avoid being discharged for excessive absences unless all seven were accumulated within one year's time. In other words, there would be no carry-over of a specific penalty level, rather each absence would be treated independently of the others. Such treatment seems inconsistent with, and would dilute, the "progressive discipline" effect of TSC's written attendance policy.

■ That, however, is beside the point. Even though Motley's interpretation of the attendance policy is a viable one, it is not how TSC interpreted or applied it prior to Motley's termination. Ooley Aff. ¶ 9. To create a genuine issue regarding this fact, Motley would need evidence that TSC had actually applied the attendance policy in the way he suggests, either in the past or with other employees. Unfortunately, Motley has offered no evidence that would contradict Ooley's testimony about how TSC's policy worked. Instead, he has merely offered his opinion about how it should have worked. He is not entitled to have a jury decide which is the better way. An employer has the right to interpret and apply its own policies according to its business needs, as long as it does not discriminate based on protected characteristics. *See Schultz,* 37 F.3d at 334.

Not only has Motley offered no evidence to show that TSC really applied the attendance policy as he now suggests, the evidence he does provide demonstrates that he understood exactly how the policy worked. From early in his employment with TSC Motley had attendance problems, as reflected in the Absentee Calendars he supplied with his response. In 1991 he accumulated four absences, leading to a verbal warning, and five tardies, resulting in a written warning. Pl's Ex. M. By March 30, 1992, Motley had five absences for that year, leading to a written warning, and he accumulated five tardies by the end of the year. *Id.* Due to a clerical error, however, the "fifth offense" level was not carried over into 1993, which worked in Motley's favor, as did a similar clerical error for another employee. Ooley Aff. ¶ 10. *Id.* In 1993, Motley collected five tardies and four absences, in addition to using more than six months of personal leave. Pl's Ex. L. By April of 1994, Motley had reached his fifth absence for that year, and between July 29 and October 28, 1994, he took another personal leave. Pl's Ex. J. After his return, he was absent a sixth time on November 4, 1994. It was this absence that carried over into the following year and led to his dismissal in July of 1995.

Motley's own testimony reveals that he was no stranger to the attendance system at TSC. He boasted that he knew how to maximize his absences or tardies, take the three-day suspension imposed for a sixth absence, and not let them "get him." Fed.Dep. at 72. "I know where the limitation is. I know how many days I can miss, and I can get to the last one." *Id.* He claims that he got to the sixth level, and took the three day suspension, for "three years in a row." *Id.* He also said he could take the suspension "on all of my stuff and still make it to the next year." *Id.* Given these admissions in his prior testimony, Motley's argument in connection with this motion as to the interpretation of the attendance policy is not persuasive. After considering the written policy, Motley's undisputed absences and the other uncontested evidence, the Court finds that Motley was not meeting his employer's expectations for attendance. Thus, he has failed to present sufficient evidence to meet prong two of his prima facie case for race discrimination.

Nor was Motley treated any less well than others with attendance problems, which is

the class of workers who would be considered similarly-situated in these circumstances. TSC has pointed to five other employees who were discharged in 1995 for having a seventh chargeable absence, Keith Bland, Jerry Bonebrake, Douglas Bowling, William Rickett and Jay Decker. Ooley Aff. ¶ 7, Ex. 1, 2, 3, 4, 5. Although Bland, Bonebrake and Bowling accumulated all seven of their absences during calendar year 1995, Rickett and Decker had chargeable offenses carried over from 1994. Ooley Aff. ¶ 7, Ex. 4, 5. All of these co-workers were white males. Paxton II Aff. ¶ 6. Motley has offered no proof to contradict this evidence or to show that any other TSC employee who had accumulated seven absences or tardies escaped the consequences of the written policy. Thus, he has also failed to meet the fourth element of his prima facie case of race discrimination.

Even if Motley had succeeded in making his prima facie case, TSC has provided a legitimate reason for his discharge: he accumulated his seventh absence under the written attendance policy. In response, Motley has offered the same arguments and evidence to show that TSC's proffered justification for his discharge was a pretext for discrimination. It fares no better in that context than it did with his prima facie case. Consequently, Motley has failed to survive summary judgment on his claim of discriminatory discharge. His claim of retaliatory discharge appears defeated for the same reasons as the discriminatory discharge claim.

Yet, Motley's theory that he was terminated in retaliation for filing a charge suffers from other weaknesses as well. Assuming that Motley's ICRC charge of discrimination constituted protected activity, and that his discharge was the relevant adverse employment action, the Court has seen no evidence of a causal link between the two. Motley filed his charges of discrimination in April and May of 1993, and his discharge occurred more than two years later, in July of 1995. Such a temporal gap does not give rise to an inference of a causal link. *See McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 797 (7th Cir.1997) (close temporal connection may satisfy causal link element, but the greater the distance between protected activity and adverse action, the less likely the two are relat-

ed); *see also Vanasco v. National–Louis Univ.*, 137 F.3d 962, 969 (7th Cir.1998) (if timing is not close, plaintiff must have something more to prove causal link).

Motley has also failed to provide something more to substantiate a causal relationship between his protected activity and his ultimate discharge. Instead, he persists in trying to show that the proffered reason for his discharge, excessive absences, was pretextual, and hoping for an inference that the real reason was to retaliate against him. His pretext argument suffers the same problem here as in his disparate treatment claim, he simply has no evidence to show that TSC's expressed reason was a lie. Rather, he merely offers his own bare assertions and arguments, which are not enough. *See Cliff v. Board of Sch. Comm. City of Indianapolis*, 42 F.3d 403, 412 (7th Cir.1994).

In an attempt to connect the discharge with his prior charge of discrimination, Motley suggests that TSC changed its attendance policy after his protected activity. According to this theory, the enforcement of workplace rules changed *because* TSC wanted to get back at him for filing his complaint, and TSC somehow knew that Motley would violate those changed rules, which would allow TSC to terminate his employment. Essentially, he asks the Court to find sufficient evidence of indirect causation to allow him to shift the burden of production to TSC. In support of this argument, he points to the fact that his 1992 offenses were not carried over to 1993, but those from 1993 were carried into 1994. Pl's Ex. J, L. He offers this as proof that TSC changed the way it administered the attendance policy after he filed his charge of discrimination, and it did so because of, or in retaliation for, Motley's protected activity. This argument would be stronger if Motley could show that he was the only employee to experience a change in the attendance policy. Yet, the evidence shows that the policy was applied equally to other Distribution Center employees. The Court finds this argument too contrived to be consistent with the notion of a causal link. Without some evidence that the changes only applied to those employees who had filed charges of discrimination, Motley fails to

make a prima facie case of retaliatory discharge on this ground as well.

■ Even if the Court could logically adopt this indirect causation argument, another problem bars its use in this case. Motley filed his charge of discrimination in April 1993, while the alleged adverse action, changing the way attendance deficiencies are carried over, occurred approximately eight months later. Again, temporal proximity will not create an inference of a causal link between the two activities. *See McClendon,* 108 F.3d at 797. "A telling temporal sequence" may establish the link, but "telling" means that "the employer's adverse action follows fairly soon after the employee's protected expression." *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 511 (7th Cir.1998). The "hint of causation" weakens as the period of time lengthens. *Id.* In *Davidson,* the plaintiff was discharged five months after she filed a charge of discrimination, and the court found that "the order in which the events occurred [did] not by itself suggest a causal link between them." *Id.* Instead, additional proof of a causal nexus was necessary for Davidson to succeed in meeting the third element of a prima facie case of retaliation. *Id.*

Like Davidson, Motley has failed to provide the additional proof of causation needed to show that the alleged change in attendance policy was a result of his charge of discrimination. Consequently, no genuine issue of material fact prevents the Court from finding that summary judgment should be granted in favor of TSC on Motley's discriminatory and retaliatory discharge claims.

### C. Unlawful Harassment

#### 1. Standards

■ By enacting Title VII, Congress attempted to pass a law that would prevent the perpetuation of stereotypes and the corresponding degrading of persons who share certain protected characteristics, both of which close off employment opportunities to those persons. *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1483 (3d Cir.1990). The underlying purpose of Title VII was to remove artificial, arbitrary and unnecessary barriers to employment when those barriers operate to discriminate on the basis of race, sex or other protected characteristics. *Id.*

The Supreme Court has held that Title VII is violated when a person is subjected to a hostile environment created by severe and pervasive harassment because of a protected characteristic. *See Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 64–65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). A plaintiff may successfully bring a racial harassment claim based on an alleged hostile environment by showing that the defendant's or its agent's conduct was "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Meritor,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Hutchison v. Amateur Elec. Supply, Inc.,* 42 F.3d 1037, 1043 (7th Cir.1994). Such a determination cannot be made by a "mathematically precise test," but instead is determined by looking at the totality of all the circumstances. *Hutchison,* 42 F.3d at 1043 (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)).

■ In *Harris,* the Supreme Court developed a non-exhaustive list of factors to be considered when determining whether a workplace has been rendered hostile or abusive. *Dey v. Colt Const. Co.,* 28 F.3d 1446, 1453 (7th Cir.1994). Although all of the circumstances must be considered, courts are to pay particular attention to the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 114 S.Ct. at 371; *Dey,* 28 F.3d at 1453. These factors must be evaluated from both a subjective and an objective perspective. *Dey,* 28 F.3d at 1454.

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is not a Title VII violation.

*Id.* (quoting *Harris,* 114 S.Ct. at 370). Therefore, courts consider not only the actual effect of the conduct, but also the effect such conduct would have on a reasonable person in the plaintiff's position. *Id.; see also Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1271–72 (7th Cir.1991). Relatively isolated incidents of non-severe misconduct will not suffice to support a claim of racial harassment. *See Saxton,* 10 F.3d at 533. But a series of offensive statements or misconduct, if sufficiently severe and pervasive, could constitute an objectively hostile environment. *Dey,* 28 F.3d at 1456.

### 2. Statute of Limitations

■ A preliminary task is necessitated by Motley's attempt to include conduct that the defendant argues is barred by the statute of limitations for Title VII claims. In this state, Title VII allows for the filing of a claim of discrimination only in relation to incidents that have occurred within 300 days of the date of the filing. 42 U.S.C. § 2000e–5(e)(1). Motley concedes that because he filed his first charge of discrimination on April 26, 1993, § 2000e–5(e)(1) would limit his claim to incidents occurring after June 30, 1992. Pl's Brf. at 4. However, he has attempted to include incidents that occurred in 1990 and 1991 as proof of the allegedly hostile environment he suffered because of his race. To justify reaching back, Motley invokes the "continuing violation" theory, which allows otherwise time-barred incidents to be brought in a charge if the plaintiff can show a present violation, and that it would have been unreasonable to expect him to sue before the statute of limitations had run on the prior conduct. *See Galloway v. General Motors Serv. Parts Oper.,* 78 F.3d 1164, 1167 (7th Cir.1996).

■ In *Galloway,* the court noted that if it was not apparent when the earlier conduct occurred that it was a discriminatory act, or if the act did not rise to the level of severity to constitute actionable harassment or identifiable harm, then a plaintiff may include it in a claim based on related conduct that occurred within the limitations period. *Id.* at 1166. The key to the continuing violation theory is to link the time-barred incidents with related conduct occurring within the limitations period. *See Speer v. Rand*

*McNally & Co.,* 123 F.3d 658, 663 (7th Cir. 1997). In this way, the linked acts are treated as one continuous act that ends within the limitations period. *Id.* The purpose is to allow a plaintiff to include prior acts "whose character as discriminatory ... was not apparent at the time they occurred." *Id.* at 663–64 (citing *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 446 (7th Cir.1994)). To successfully employ this tactic, Motley needs to show why it would have been unreasonable for him to have recognized that he was the victim of discrimination at an earlier date.

Instead, Motley claims to have been the victim of racial harassment from the first day of his employment at TSC, and he admits that he waited three years to file a grievance, a formal complaint, or a charge of discrimination. To explain this neglect of his civil rights, Motley states that he did not think it was that bad at first, which might justify use of the continuing violation theory if a reasonable person would have thought the same. He also argues that he did not know an employee could file against his company, and he thought that if he complained to his employer, nothing would be done about it. ICRC Dep. at 203. Nevertheless, he now maintains that he should not be penalized for tolerating relatively isolated instances of bad conduct while giving his employer time to remedy the situation. Pl's Brf. at 4–5.

In fact, it is TSC's continuing failure to take reasonable steps to remedy a "known racial harassment problem," that Motley claims is the relevant continuing violation of Title VII. Pl's Brf. at 4. According to Motley, it would be improper to hold him to the 300–day limitations period, and consequently bar his inclusion of the earlier conduct from this claim, for "having faith that [his] employer [would] remedy the situation." Pl's Brf. at 5. This same "tolling" argument was rejected by the court in *Speer,* and Motley does not establish why it was more reasonable for him to tolerate the alleged earlier harassment than for Speer to do so. *Speer,* 123 F.3d at 664.

It is undisputed that Motley was aware of the nature of the alleged acts he wishes to include—he even complained about one of them to a supervisor long before its statute

of limitations expired. However, Motley's own testimony is that he did not report the conduct to his employer because he thought it would be futile. At the same time, he argues in his brief that he did not file a charge within 300 days of the earlier conduct because he "had faith" that his employer would remedy the situation. He does not explain this faith in his employer with respect to when he would file a charge and its absence in connection with making an internal complaint. Nevertheless, the 300 day period of limitations is intended to provide a reasonable amount of time in which the employer could remedy a known discriminatory situation. When that does not happen, the employee is expected to file his charge, or forget it. However, the employer is not obligated by Title VII to act unless it knows, or should have known, that the employee has been wronged.

Thus, Motley's "continuing violation by failure to remedy" theory will not work without some evidence from which a jury could conclude that TSC knew or should have known of the alleged harassment prior to the time of the grievance and the charge. *C.f. Jansen v. Packaging Corp. of America,* 123 F.3d 490, 493 (7th Cir.1997) (employer who is negligent in hiring, supervising, monitoring or retaining plaintiff's supervisor is liable for supervisor's harassment). Motley argues that "it is simply impossible that TSC management was unaware of any harassment." Pl's Brf. at 12. His support for this argument is not sufficient to show that TSC knew or should have known about the alleged harassment. Absent knowledge of any wrongful conduct, TSC could not be found to have continued to violate Title VII by failing to remedy a known racial harassment situation.

Motley primarily wishes to include the alleged racial insult by Bland within the first three months of his employment in 1990, and the 1991 incident in which "nigger" was allegedly scratched into the paint of his car in TSC's parking lot. With respect to the Bland incident, Motley knew it was racially discriminatory, and he complained about it to a supervisor, who took no action to remedy it. Three hundred days later, the statute of limitations on this incident had run. Motley seeks to include Bland's 1990 insult in this action because he claims that Bland continued to harass him throughout his employment at TSC, culminating in the fight in June of 1995. The trouble is, Motley was told when he first reported Bland's conduct that TSC could do nothing because Motley was still a probationary employee.[10] Thus, Motley knew, or should have known, that if Bland's conduct continued after his probationary period ended, he could report it again to the Distribution Center's manager and obtain assistance. At no time does Motley claim to have done so, nor does he explain why he did not return to Lippman.

Instead, he claims he reported it to other unspecified supervisors, at unspecified times, and to Pompey, a supervisor Motley contends was also harassing him. When he reported it to Pompey he was allegedly told, "forget about it," and "don't worry about it." Motley Aff. ¶ 12. Motley did not file a grievance against Bland, or talk to his union steward about the problem, or talk to his own supervisor about it. Moreover, he provides no specific details of Bland's "continued harassment," nor does he describe the content of his alleged reports about it. He also fails to explain how the character of Bland's conduct as racially harassing was not evident when it happened. It cannot be disputed that it was.

For these reasons, Bland's 1990 conduct does not qualify to be included under the continuing violation theory, and will not be considered as evidence in this action. With no specific evidence about Bland's subsequent conduct, until the June 1995 incident, or any collaboration of Motley's alleged reports of the continued harassment, the Court sees no reason to consider any of the alleged harassment by Bland in this action. Nor is there sufficient evidence from which a rea-

---

**10.** Although having no bearing on the outcome of this matter, the mistaken notion that probationary employees are somehow not protected by Title VII must be corrected. TSC may have a policy under which a probationary employee is not protected by the anti-discrimination provi-

sions of the CBA, but that does not mean that an employee who is still in a probationary period cannot bring a charge of discrimination if appropriate. Nothing in the statute distinguishes between probationary and non-probationary employees.

sonable fact-finder could find that TSC knew about Bland's conduct and failed to take action to stop it. At best, Motley has described two isolated instances of racially derogatory statements by Bland, and vague and unspecific allegations of having reported it to TSC supervisors, neither of which are enough to constitute a continuing pattern of severe and pervasive abuse.

■ The alleged car-scratching incident is more easily resolved. Motley stated during his deposition for his ICRC case that it had happened in 1991.[11] ICRC Dep. at 202–03. He also stated that he did not file a charge of discrimination in 1990 or 1991 because the harassment was "not that bad," and he did not think anyone would do anything about it. ICRC Dep. at 203. According to Motley, he decided that if anyone else touched his car, he would take matters into his own hands. *Id.* Motley's decision to ignore internal complaint procedures is not a legitimate reason to fail to notify management of an incident that involved such clear racial discrimination, and which injured him in such a concrete way. Acts of harassment that are "so discrete in time or circumstances that they do not reinforce each other cannot reasonably be linked together into a single chain, single course of conduct, to defeat the statute of limitations." *Galloway,* 78 F.3d at 1166. This isolated incident cannot be linked to any of the incidents that occurred in the limitations period.

First, it was not reported to TSC, so it cannot constitute a continuing violation of Title VII by failing to remedy unlawful conduct. Second, it is not reasonable for him to dismiss such permanent damage to his vehicle, using a racial epithet that Motley now contends "quickly alters the conditions of employment and create[s] an abusive working environment," as minimal. *Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir.1993). Finally, no related inci-

dents occurred in the limitations period that could be linked to the car scratches and bring them into the current controversy. Motley's failure to report the car incident to anyone does not fall within the type of reasonable conduct that would allow a time-barred incident to be included in a subsequent claim. Motley may not take advantage of the continuing violation theory to include this event in his present harassment claim.

Even if TSC knew or should have known of the alleged harassment, Motley's attempt at invoking the continuing violation theory based on TSC's failure to remedy the problem is without merit. If it were possible to "link" earlier incidents and those within the limitations period by the employer's "failure to remedy" them, then the statute of limitations period would seldom end in many hostile environment cases. An employer who acts in a way that is reasonably designed to stop the harassment, even if the harassment stopped temporarily before resuming, would continue to be vulnerable to a charge of discrimination when the harassment resumed. *See Speer,* 123 F.3d at 664. In many cases, "the circumstances in the workplace (like a supervisor continuing to work with an employee) often do not change even though discriminatory acts cease." *Id.*

Instead, the link would have to be some covert policy or practice of the employer's that could be shown to facilitate, encourage, or ignore, the type of conduct about which the employee is complaining. *See Id.* at 663. Motley has failed to produce any evidence to create a genuine issue of material fact about whether TSC had any kind of covert practice or policy of refusing to take reasonable steps to remedy known racial harassment. For this reason also, he may not employ the continuing violation theory to bring these earlier acts within this controversy.

---

**11.** His subsequent attempt to bring the action within the 300 day period, by stating in his affidavit that it happened in 1993, will not suffice. *See Russell v. Acme–Evans Co.,* 51 F.3d 64, 67–68 (7th Cir.1995) (when deposition and affidavit are in conflict, the affidavit is to be disregarded unless a mistake in deposition is demonstrable). Other evidence produced by Motley supports a finding that it occurred at the earlier date. For example, Motley mentioned the car

incident in his April 19, 1993, grievance filed with the Union. Paxton I Aff., Ex. 1(a). This contradicts his affidavit testimony that it happened "on or about early summer 1993." Motley Aff. ¶ 14. In addition, Motley claims to have been on a "stress leave" from May 21 to November 30, 1993, making it difficult for his car to be vandalized in the company parking lot in early summer of 1993.

### 3. Timely Allegations

What is left are Motley's allegations of harassment by an African–American supervisor, Pompey, by Ooley, supposedly at Pompey's direction, by various other supervisors and co-workers, as well as the rope display and the time card and production sheet incidents. For purposes of this motion, the Court finds it useful to differentiate between alleged harassment before Motley filed his charge of discrimination and that which he claims occurred afterward. Hampering this strategy is the fact that the deposition testimony provided by the parties frequently fails to indicate the time of any given event. It is also complicated by changes in Motley's testimony between his first and second depositions, and also between his depositions and his affidavit.

 First, with respect to Pompey, the Court notes that Motley has certainly described a hostile relationship between himself and this supervisor, and one that was obvious to others. What he has failed to show, however, is that the difficulties Motley experienced with Pompey were because of Motley's race. In fact, he specifically testified that it was not because of his race. ICRC Dep. at 95. According to Motley, he and Pompey did not get along from "day one." ICRC Dep. at 94.

Q Why did Mac [Pompey] single you out?

A Because we never did get along.

Q It has to do with your race?

A Not my race, but Mac. . . .

ICRC Dep. at 95.

When Motley began working at the Distribution Center there were only three African–American employees: Motley, Pryner and Pompey. Penny Aff. ¶ 2; Motley Aff. ¶ 7. In Motley's second deposition he states that he and Pryner got along with Pompey at first. Fed.Dep. at 70. Then, Pompey was promoted to a supervisory position in September of 1991, and in March of 1992 TSC hired Ory Penny, an African–American, as a supervisor. Id.; ICRC Dep. at 212. No complaints have been lodged against Penny, who was Motley's direct supervisor from March 1992 to July 1993. However, according to Motley, once Pompey became a supervisor he began using "racial slurs," such as "nigger" and "boy," when addressing Motley and Pryner.

Motley Aff. ¶ 8; ICRC Dep. at 220; Fed. Dep. at 68; Kimble Dep. at 69–70. He also "came after" Motley and Pryner, and allegedly told them he was "going to get rid of you two niggers." Fed.Dep. at 70. However, Motley said he would not interpret "nigger" as a racial statement coming from a fellow African–American. Fed.Dep. at 69. Instead he thought of it as a comment like "Go on with your business." Id.

In fact, Motley stated that it is not uncommon for blacks to use the word "nigger" with each other—"It's just an expression when we say it." ICRC Dep. at 321. Motley himself uses the word with his brothers and his friends, but he did not use it with Pryner or Pompey and he indicated he did not like for Pompey to use it with him. Id. at 322. Motley asserted that intra-racial use of the word is not offensive "because we know where we're coming from, we know where it stands. We grew up with the word 'nigger.'" Id.; Fed.Dep. at 69–70. Yet, when Pompey used it as a supervisor, Motley considered it a racial statement. Fed.Dep. at 70. **He explained that Pompey used it because of what he was and what Motley was not. ICRC Dep. at 218.** Before Pompey became a supervisor, "He never even used the word. I mean, I don't understand why he clicked like that." Fed.Dep. at 68. Motley does not further explain why use of the word by Pompey would be acceptable before he became a supervisor, and a racial slur thereafter. At most, the explanation he gives is ambiguous. He is also unclear about how often Pompey used the word, and when.

During his 1995 deposition, Motley stated that Pompey used the word constantly, or "dozens and dozens" of times, or "over fifty" times during the time Pompey was a supervisor. Fed.Dep. at 68–69. In an earlier deposition, however, Motley stated that Pompey had mostly just called him "boy" or "poor trash," but "once he used 'stupid nigger'." ICRC Dep. at 68, 220. Later during that same deposition, Motley said Pompey used the word "nigger a few times, because of what he is and what we ain't. 'You niggers will never be like me.'" ICRC Dep. at 218. As with much of Motley's testimony, this evidence is ambiguous and the context does

not help to clarify its meaning. Motley admits he did not complain to management about Pompey's racial comments, but says he did report it to his union steward. ICRC Dep. at 154. The steward did nothing to help him. *Id* . The deposition in which Motley stated he did not complain to management about Pompey's comments was taken in October of 1994.

Motley has subsequently stated in his affidavit, dated July 3, 1996, that on a number of occasions he complained to a "TSC manager," Daniel Zuerlein, about Pompey's "various acts of discrimination." Motley Aff. ¶ 9. In response, Zuerlein allegedly told him that "it was TSC's position" that because Pompey was also black, it could not be race discrimination. *Id.* To reconcile Motley's apparently conflicting affidavit with the prior sworn testimony, the Court notes that there was a period of nine months between the earlier deposition and Motley's discharge, during which he might have reported Pompey's conduct to Zuerlein. Thus, for purposes of this motion, the Court finds that Motley's reports to Zuerlein must have occurred between October 1994 and July 1995.

The following testimony cannot be reconciled. Motley attests to receiving a similar message in December 1992 from an owner of TSC, Jerry Newkirk, "who had knowledge" of the Pompey problem. Motley Aff. ¶ 10. While Newkirk acknowledged that Pompey was very hard on Motley and Pryner, "his excuse was that all three were black." *Id.* This testimony directly conflicts with Motley's 1994 deposition statement that he did not complain to management about his problems with Pompey. Aside from the contradiction of his previous sworn testimony on this point, Motley's affidavit does not provide enough specific facts to show that it is based on personal knowledge. *See Russell,* 51 F.3d at 68. Motley does not state specifically when or how Newkirk came to learn of the alleged harassment, or how Motley knew that Newkirk knew about the problem. Rather, he just makes bare assertions of fact without demonstrating how those facts came within his personal knowledge. Such testimony is not enough to create a genuine issue of material fact regarding Newkirk's knowledge of the alleged problem with Pompey

when he responded to Motley's alleged complaint about this supervisor.

Finally, Motley generally reports that other supervisors "who were given information relating to the conduct of Pompey" included Paxton and Diedring. Motley Aff. ¶ 11. This additional assertion suffers the same problem as the one about Newkirk, and will be disregarded. No facts were related in the affidavit to show how Motley knew that Paxton and Diedring were given information about Pompey, or what they were told, or when. Similarly, the statement that TSC "showed no inclination and made no attempt to take any corrective action," Motley Aff. ¶ 11, is conclusory and provides no basis for the Court to determine whether such a statement was within the grasp of Motley's personal knowledge. Instead, Motley's racial harassment case against Pompey seems to be one "in which the only evidence submitted in opposition to the employer's motion for summary judgment is the plaintiff's own testimony." *Russell,* 51 F.3d at 68.

It cannot be disputed that Motley and Pompey's relationship "fell apart" after Pompey became a supervisor. Fed.Dep. at 409. The question is, why did that happen. Motley admits he did things that would irritate Pompey. Sometimes he teased Pompey about his physical abilities, which embarrassed Pompey. Fed.Dep. at 74; ICRC Dep. at 151. Specifically, Motley reports that Pompey did not like to be embarrassed and "I always call him a slow person. I say, 'You slow, man. You can't outrun me.' I mean, this just went on." Fed.Dep. at 74. Apparently Pompey tolerated Motley's antics when they were both warehouse associates. However, when Motley's teasing and ridicule continued after Pompey became a supervisor, his reaction to it changed.

In addition, Motley reports conversation with Pompey in which his remarks to this supervisor border on insubordination. For example, he described a situation in which Pompey told him to stop talking and get to work, and Motley responded with, "Now wait a minute. Why do you keep telling me?" ICRC Dep. at 226. Another example is when Pompey accused Motley of doing something, and "cussed [him] out up in front."

Fed.Dep. at 82. Motley responded by saying, "Man, you get the hell out of my face." *Id.* He then denied having done anything wrong. In his deposition he expressed incredulity that Pompey did not come back later and apologize to Motley. *Id.* at 83.

According to Motley, when Pompey became a manager the "racist came out of [him]." Motley ICRC Dep. at 150. Pompey threatened to "get rid of Motley," and he pressured Motley's immediate supervisors to discipline him. Bonebrake Dep. at 11. He also told Motley and Pryner that they would never get a "lead" position, and that he would see to it. Kimble Dep. at 29–32. Lead positions paid a higher rate of wages. According to Kimble, this statement was made after the leads had been chosen in March of 1993 and they were already functioning in their new positions. *Id.* at 29. In addition, Pompey allegedly threatened Motley with physical harm, such as stating he ought to shoot him. Dugger Dep at 32–43.[12] Specifically, Dugger said she witnessed Pompey ride up on a golf cart to Motley and Vince Pryner, and say "maybe I ought to just buy a gun and blow you both away and get it over with." *Id.* at 43. She said this happened within days of Pryner going on a stress leave in 1994. *Id.*

Kimble testified that he overheard Pompey tell Motley and Pryner, "if you niggers don't hurry up and get busy ... I'm thinking about shooting your ass," Kimble Dep. at 31–32. He said that this happened just before Pryner went on a stress leave, which was in 1994. However, during Motley's earlier deposition, he specifically said that no one had physically threatened him. ICRC Dep. at 227. He then amended that testimony in a subsequent part of the deposition. He said that Pompey made a "physical threat" to him once, which was when Motley told Pompey he had gotten a handgun and Pompey said he could get one too. ICRC Dep. at 227. However, it is unlikely that a reasonable juror would consider Pompey's statement as a threat, but rather a careless response to Motley's statement about getting a gun. In contradiction to this report of Pompey's remark about getting a gun, Motley clearly denied in October of 1994 that he had been physically

threatened by anyone at TSC. ICRC Dep. at 227.

In fact, he responded to the direct question, "Did [Pompey] ever threaten to do something to you physically?" by saying, "Not really." ICRC Dep. at 232. This testimony was taken in October of 1994, and Motley was not discharged until July of 1995, leaving nearly nine months for additional incidents to occur. Motley did not mention in his September 1995 deposition, however, that Pompey had threatened his life. In fact, when asked why he changed his telephone number he said it was because he was getting threats from employees at TSC, but in response to the inquiry about which employees, he said, "I don't know." Fed. Dep. at 5-6. By the time he signed his 1996 affidavit, Motley's memory had apparently improved and he stated that Pompey approached him in the spring of 1995, and "threatened physical harm." Motley Aff. ¶21.

The Court is not inclined to allow Motley to contradict admissions in his prior deposition testimony with bald assertions in a subsequent affidavit that are inconsistent with the prior statements. See *Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir.1994)(depositions are inherently more reliable due to their adversarial nature and opportunity for direct and cross-examination); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir.1985)(party may not create credibility issues by contradicting own earlier sworn testimony). Accordingly to Motley, Pompey said "you two niggers [Pryner and Motley] both better get out of this warehouse before someone dies." *Id.* He also said that Pompey told him that TSC management had instructed him to get rid of Pryner and Motley, and "he would do so—dead or alive." *Id.* Pompey allegedly showed Motley a gun in an attempt to intimidate him. Id. ¶22. These statements reference drastically different conduct by Pompey in the spring of 1995, than any described by Motley during his September 1995 deposition. The inconsistency makes the latter statement suspect and inadmissible, or at least insufficient to create a genuine issue of material fact on whether

12. Only pages 42 and 43 of Dugger's deposition were included with Motley's brief, making it difficult for the Court to fully evaluate this contention.

Motley was ever physically threatened by Pompey.

Basically, the evidence shows that Motley and Pompey had a poor working relationship, that Pompey was promoted to supervisor, that he began to criticize Motley, and that at least once he called Motley a "nigger." Motley did not consider his problems with Pompey to be related to his race, but more like personality problems. In addition, he submitted that African-Americans use the expression "nigger" among themselves, and usually do not mean anything racially derogatory by it. He also conceded that most of the "harassment" from Pompey was about how Motley was performing his job or was otherwise work-related. ICRC Dep. at 224-26. Even the "threats" overheard by other employees related to how Motley and Pryner were doing their work. For example, Kimble overheard Pompey tell Motley and Pryner to "hurry up and get busy" or he would "shoot" them. Kimble Dep. at 31-32. Motley may have been "hassled" by Pompey, but none of the evidence would support a jury concluding that this conduct was directed at Motley because of his race, in the face of Motley's statement to the contrary.[13]

Motley's other evidence of a racially harassing environment is less persuasive. The only racial slurs that were directed specifically at Motley prior to his charge of discrimination, either to his face or within his earshot, were the ones by Pompey and Bland. Consequently, the testimony about what other workers may have overheard from Kilbarger, Diedring, or Kerulis, does not prove that Motley was harassed or subjected to a racially hostile environment. In fact, it is of doubtful relevance to that issue since most of the described incidents occurred after the April 1993 charge of discrimination. Nor can Motley claim a "racially hostile environment"

based on the use of racial slurs and derogatory statements that he personally did not hear or know about. He has offered no evidence that he was aware of any other supervisors using the word "nigger" besides Pompey prior to his 1993 charge. Instead, he has described seemingly isolated incidents with Pompey, who is also black and who Motley claims was not harassing him because of his race, and Bland, who made a racially derogatory statement in 1990 and another one in June of 1995. None of this evidence creates an issue of fact about whether Motley was subjected to a pervasive, racislly hostile environment.

■ According to Motley, the alleged harassment from Ooley occurred because Pompey told her to keep an eye on Motley and Pryner. Ooley was promoted to a supervisory position in February of 1993, and after that she allegedly began to make Motley's job more difficult. ICRC Dep. at 212. Although Motley admits she made no racial comments to him, he believed she was "harassing" him by singling him out to criticize for "minor things," when other white employees were also in need of correction in Motley's view. ICRC Dep. at 212-214. In fact, he admitted that this was the only reason he believed that Ooley was a racist. ICRC Dep. at 213. Motley defined Ooley's "harassment" as walking up to a group of employees and criticizing him and not saying anything to the other employees who are white. *Id.* at 214. According to Motley, Ooley told him that Pompey had directed her to keep an eye on him and Pryner. *Id.* at 214. The Court is not left to speculate, however, as to why Ooley was asked to watch the two. Ooley said that Pompey told her to watch them because they "are too lazy." Fed. Dep. at 239. Motley also stated that she made this

---

**13.** By so finding, the Court does not intend to condone the use of this type of language in the workplace by anyone. "Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir.1993) (citations omitted). Had there been no evidence that Motley usually did not consider use of the word "nigger" by another African-American offensive, that Motley and Pompey had a personality conflict, and that Motley did not believe their problems were related to his race, Motley's racial harassment claim might have come out differently. It would have been appropriate to proceed further into the analysis of whether Pompey's conduct created a racially hostile environment for Motley, that TSC should have known about and failed to remedy. *See Hansborough v. City of Elkhart Parks & Rec. Dept.*, 802 F.Supp. 199 (N.D.Ind.1992).

remark before he filed his charge of discrimination. *Id.*

It is understandable that a person who feels he is being singled out for criticism, while others he thinks should be criticized were being ignored, would feel that the situation and treatment were unfair. In this respect, Motley's position is understandable. Yet, none of Ooley's conduct even approaches the level of severity that would unreasonably interfere with Motley's work performance, or create an intimidating, hostile, or offensive work environment. *See Saxton v. American Telephone & Telegraph Co.*, 10 F.3d 526, 533 (7th Cir.1993). Besides, Motley has provided testimony that demonstrates he was not intimidated by Ooley. Once, when she asked him why he was out of his area, he responded, "Why don't you tell them to get busy [referring to other workers nearby]? I'm in my area," ICRC Dep. at 213. This remark indicates a lack of respect for Ooley as a supervisor that approaches insubordination. A person who feels intimidated and threatened by his supervisor would not likely talk back this way.

■■■■ Motley's job was to follow workplace rules and not second-guess his supervisors' decisions about which employees needed correction and which did not. Title VII does not protect against "unpleasantness per se ... but only against discrimination in the conditions of employment" because of the protected characteristic. *Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 885 (7th Cir.1998) (quoting *Carr v. Allison Gas Turbine*, 32 F.3d 1007, 1009 (7th Cir.1994)). None of the instances described about Ooley's conduct are sufficiently severe or pervasive as to alter the conditions of Motley's employment and create an abusive working environment as contemplated by the law. In fact, they do not rise above the level of mere unpleasantness or unfairness, against neither of which Title VII protects. *See Saxton,* 10 F.3d at 534–35. Nor is there anything, other than Motley's subjective view, to show that

Ooley's treatment of him was because of Motley's race.

Motley also produced evidence that his work performance was not affected by the alleged harassment, which further weakens his racial harassment claim. One factor examined when determining if an employee is the victim of a hostile environment is whether the conduct unreasonably interferes with the employee's work performance. *See Harris,* 114 S.Ct. at 371. Even though he blames his attendance problems on the harassment, Motley's performance when he was on the job was apparently quite good. This factor also weakens his claim of racial harassment.

■■■■ The only remaining evidence of alleged harassment prior to the charge of discrimination is the rope incident.[14] Motley claims that on multiple occasions, "hangman's nooses" were displayed from the ceiling beams "all through the warehouse." Fed. Dep. at 157. He said they first appeared when he started working there in 1990, during contract negotiation time. *Id.* Further, he said that, "All the way from '90 contract on up. There was lynch ropes all through that period." *Id.* at 198. In his September 1995 deposition, Motley testified that someone started putting up drawings with the ropes, and attaching names to them, including Motley's. *Id.* at 199. Yet, in his 1996 affidavit, Motley stated that "on several occasions" ropes that had been used to tie bundles of products "were fashioned into so called 'hangman's nooses' or 'lynching ropes' and hung among the beams in the TSC warehouse." Motley Aff. ¶ 15. No mention was made of any pictures. According to Motley, he notified the manager and his supervisor about them, but on "one occasion the ropes were not removed until some time prior to the visit" of TSC owners during the winter of 1994. *Id.*

To counter Motley's testimony about the ropes, the defendant has offered the testimo-

---

**14.** The time card incident that prompted Motley to file a grievance and a charge cannot be seen as racial harassment in light of Motley's testimony that he did not see what was written on the card, he was not told what was written, or that the writing contained a racial slur. No testimony was offered from the employee who allegedly found the card, regarding the nature of the writing thereon. For these reasons, a rational juror could not reasonably link this isolated act by an unknown person with the notion of discrimination because of Motley's race.

ny of Penny, an African–American supervisor, who recalled only one rope incident that occurred during contract negotiations in early 1993, when labor-management relations were strained. Penny Aff. ¶ 3. Penny recalled that this incident was considered to be an act against management, with no racial implications. *Id.* The rope was removed the day Penny saw it. *Id.* Penny's testimony is corroborated by that of Lloyd Paxton, who stated that in early 1993, employees opposed many of the company's bargaining proposals and "merchandise and equipment was being damaged by unidentified persons." Paxton I Aff. ¶ 8. Paxton stated he "heard of a rope left hanging in the 'consolidation' area of the warehouse and went to see it but it had apparently been removed by the time [he] got there." *Id.*

The testimony of these managers, and the fact that all three men agreed that the rope displays occurred during contract negotiation periods, strongly suggest that a more reasonable inference to draw from this conduct is that it was related to labor negotiations. In addition, Motley filed five grievances with his union, and two charges with the ICRC regarding the alleged harassment to which he was being subjected at TSC. The first grievance was filed on April 19, 1993, and it did not mention anything about any lynching ropes. Paxton I Aff., Ex. 1(a). Nor do any of the other grievances filed on January 10, 1994, May 10, 1994, July 21, 1994, and December 19, 1994, mention such displays. *Id.,* Exs. 1(d)–1(g). In fact, the only time Motley mentions a lynching rope incident is in the charge he filed with the ICRC on April 26, 1993. *Id.,* Ex. 1(b). In it, he mentioned, almost in passing, that "lynching ropes have been hung from the warehouse ceiling." *Id.* If these ropes were as pervasive as Motley claims ("all through the warehouse" and throughout the entire period from 1990 on), it seems he would have mentioned them more often than just once in a complaint. It would also seem that other employees would have noticed them. The absence of their testimony about ropes is telling.

Moreover, even if every rope incident reported by Motley in his September 1995 deposition were accepted as true, it would not be enough to show that he was subjected to a hostile environment because of his race.

First, he has no evidence, other than his own subjective opinion, that the ropes were hung for any racially derogatory purpose; second, his testimony is inconsistent from one deposition to the next about the number of incidents, what occurred, and when; third, the ropes were apparently taken down upon discovery on all but one occasion according to Motley's own testimony; and finally, the evidence supports an alternative, anti-management, motive behind the rope display, which renders the ropes' usual meaning ambiguous. Penny, an African–American supervisor, specifically stated that the ropes were not understood to be a racial comment. Motley's formal complaints only mention the ropes once. Instead of serving as the foundation for Motley's racial harassment claim, the alleged rope incidents function more as an after-thought. Thus, it is hardly the type of activity that would have severely interfered with his workplace environment and rendered it hostile and abusive.

■ Even if the alleged use of racial slurs, unfair singling out for discipline, and rope incidents were determined to constitute harassment on the basis of race, Motley cannot overcome the fact that once he complained about the incidents, action was taken to stop them. For example, he admits that the ropes were all removed, except for once when they were left up for a longer time. When he finally reported Pompey's alleged use of racial slurs, he was given the direct line of one of TSC's vice presidents and instructed to call him if any further incidents should occur. The time card incident, which prompted his grievance, was investigated by both Penny and the Union. They could not determine the culprit, but it is reasonable to assume that their quick response sent a message that TSC would not tolerate such conduct.

■ Motley indicated that he would have liked a meeting at which Pompey, Ooley, the plant manager, and Motley could sit down and discuss these problems. ICRC Dep. at 235. Instead, he got the phone number of a corporate vice president to call if it happened again, and prompt investigations by the Union and his supervisor to determine the identity of the anonymous harasser. Just be-

cause the employee expected more from the employer, or a different response, does not mean that the employer failed to take appropriate remedial action, once it was on notice of the problem. The test is whether the employer took reasonable steps to discover and rectify the harassment of its employees. *See McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 480 (7th Cir.1996). As long as the action taken is reasonably likely to prevent further harassment, the employer is not held liable if the action it took did not ultimately succeed. *Id.; see also Speer*, 123 F.3d at 664 (that resolution of internal complaint is different than employee would have liked is not an actionable wrong).

■■■■ Because he first filed a grievance with the Union, Motley's complaint was investigated by union representatives. Yet, before that investigation could be completed—in fact, within a week of the first formal notice to his employer—Motley filed a charge with the ICRC. He has failed to provide sufficient evidence to show that TSC did not take appropriate remedial action in response to his reports of harassment immediately prior to his charge of discrimination.[15]

Nevertheless, the evidence suggests that Motley's environment changed after he filed his charge of discrimination, which raises the question of whether Motley was harassed in retaliation for filing a grievance and a charge against Ooley and Pompey.

### 4. Retaliatory Harassment

To establish a prima facie case of retaliation, Motley must show that he engaged in a legally protected activity; his employer subsequently took adverse employment action against him; and the employment action was caused by his participation in the protected activity. Recently, the Seventh Circuit noted that nothing in the "law of retaliation restricts the type of retaliatory act" that could satisfy the second element of the prima facie case. *Knox v. State of Indiana*, 93 F.3d 1327, 1334 (7th Cir.1996) (citing *McKenzie v. Illinois Dept. Of Transp.*, 92 F.3d 473, 485 (7th Cir.1996) (questioning whether retaliatory act must be job-related); *Smart v. Ball State University*, 89 F.3d 437, 440–41 (7th Cir.1996)). In *Knox*, the court approved of the district court's instruction that employers could be liable for retaliating against a complainant by letting her co-workers "punish" her for invoking her rights under Title VII. *Knox*, 93 F.3d at 1334–35. Knox's co-workers had retaliated against her by "fellow worker harassment and vicious gossip." *Id.* at 1335.

■■■■ Another recent case pertains to the third element of the prima facie case, wherein a plaintiff can show causation by demonstrating that the protected activity and the adverse action "were not wholly unrelated." *Hunt–Golliday v. Metropolitan Water*, 104 F.3d 1004, 1014 (7th Cir.1997). In *Hunt–Golliday*, the plaintiff offered evidence of "a pattern of criticism and animosity by her supervisors following her protected activities." *Id.* She took a disability leave from May to October, but when she returned "her supervisors picked up right where they [had] left off." *Id.* at 1015. The court found that pattern sufficient to support the existence of the causal link. *Id.* Here, Motley claims that he suffered a pattern of harassment and animosity following his protected activities. However, he has also alleged a similar pat-

---

**15.** It is important to note that TSC had an "Open Door" policy, in which employees were encouraged to go to successive levels of management to get their problems resolved whenever they are dissatisfied with the results at a lower level. Motley has presented no evidence to show that he used this policy other than his vague statements about various supervisors having knowledge of the problem.

The Supreme Court has recently clarified the law relating to employer liability in situations of actionable sexual harassment by supervisors. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998). Essentially, an employer may be held vicariously liable for an actionable hostile environment "created by a supervisor with immediate (or successively higher) authority over the employee." *Id.* When no "tangible employment action" is taken by the supervisor, the employer may raise an affirmative defense comprised of proving that the employer exercised reasonable care in preventing and correcting promptly any "sexually harassing behavior," and that the employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* Applying the sense of this holding to the facts in this case, Motley is vulnerable to a claim that he failed to take advantage of corrective opportunities available from his employer when he failed to use the Open Door policy.

tern before he filed his charge. As TSC notes, without evidence of a "ratcheting up of the harassment," Motley's designation of a pattern of harassment after the charge cannot prove that the charge and the adverse employment action were related. *See McDonnell v. Cisneros,* 84 F.3d 256, 259 (7th Cir.1996). The Court finds that Motley has provided sufficient evidence to demonstrate such a "ratcheting up."

Both parties assume for purposes of the motion that the first element of the prima facie case was met by the fact that Motley filed two charges with the ICRC in April and May of 1993. Following those charges Motley claims to have experienced a different form of harassment from Pompey than previously—one that appeared to Motley to be motivated by anger that Motley had filed charges against the company and had named Pompey and Ooley in those charges. Although not always entirely clear, the evidence shows that Pompey's criticism of Motley and Pryner was intensified after they filed their charges of discrimination, and that it became more personal, and less directed at their job performance. For example, in April of 1993, after Motley "filed against Lisa [Ooley]," Pompey called him a "stupid nigger." ICRC Dep. at 220. Up to that point he had been calling him "boy," and "poor trash," and occasionally "nigger." The addition of the adjective "stupid" suggests that Pompey was not happy with the fact that Motley had chosen to exercise his right to complain about perceived discrimination. The temporal relationship between the complaint and Pompey's retort further supports the element of causation.

In addition, TSC states that no one in management had known that Motley felt he was being "racially" harassed by Pompey until he filed his grievance. In fact, the attitude of those to whom Motley had complained had been that there was no such thing as intra-racial harassment. Once Motley formally complained about Pompey and Ooley, TSC was on notice of the nature of his complaints against these two supervisors. What is missing from the evidence, however, is any description by TSC about what steps it took to investigate the allegations against Pompey and Ooley. Instead, the evidence only shows that the Union asked for, and was

given, time to investigate the time card incident mentioned in Motley's first grievance. No evidence has been presented that would lead a rational fact-finder to conclude that TSC took Motley's charges of racial harassment by Pompey and Ooley seriously and undertook an independent investigation, much less any corrective action.

■ For various reasons, the Court has already found insufficient evidence to create a factual issue about whether Motley was subjected to a hostile environment because of his race prior to his charge of discrimination. However, once his accusation of racial harassment came to light, TSC was not entitled to sit back and not investigate it. *See EEOC v. General Motors Corp.,* 826 F.Supp. 1122, 1125 (N.D.Ill.1993). At the least, the defendant should have conducted an investigation into the harassment charges against the two supervisors, as it would have been expected to do if no charge had been filed. To do otherwise constitutes an act of retaliation against an employee for filing a charge. *Id.* (citing *EEOC v. Board of Governors of State Colleges,* 957 F.2d 424, 427–29 (7th Cir.), *cert. denied,* 506 U.S. 906, 113 S.Ct. 299, 121 L.Ed.2d 223 (1992)).

No evidence has been presented to show what the company did in response to the April and May 1993 complaints by Motley, other than to allow the Union to investigate. A reasonable inference is that it did not investigate. Whether the absence of investigation is because TSC did not want to duplicate the efforts of the Union, or the ICRC, both of whom it expected to conduct an investigation, or whether it was because of its animosity toward the plaintiff for having complained, is an unresolved factual issue. A reasonable inference is that TSC had a policy of not investigating an employee's complaint of discrimination if he or she files a charge right away. Such a policy would constitute a violation of the anti-retaliation provisions of Title VII. *See EEOC v. Board of Gov.,* 957 F.2d at 427–28. It would also be reasonable to conclude that management at TSC was angry with Motley for filing his complaint with the ICRC and naming specific supervisors, and for that reason it refused to investigate. As the non-movant, Motley is entitled

to either of these inferences, both of which lead to a finding of retaliation.

Motley points to another incident as evidence of retaliation against him for filing a charge of discrimination. On May 5, 1993, Motley received a "written reprimand [for] attendance problems." Paxton I Aff., Ex. 1(c), May 10, 1993 Charge. Neither party has provided the Court with a copy of this alleged reprimand, but TSC has not disputed that it occurred. Upon review of the 1993 Attendance Calendar, however, the Court notes that by May 5, 1993, Motley had used his three "free absences," he had accumulated three tardies, and he had four occasions where he left work early. Ooley Aff., Ex. 8. Thus, it is not clear what he could have been disciplined for, unless it was for leaving early for the fourth time on Friday, April 23, 1993. The attendance policy only calls for a verbal warning with a fourth offense.

Motley filed his charge of discrimination on Monday, April 26, 1993, followed within ten days by the written reprimand for attendance problems. The close temporal proximity between the two raises an inference that the reprimand was not unrelated to the charge of discrimination. *See Johnson v. City of Fort Wayne*, 91 F.3d 922, 939 (7th Cir.1996) (citing *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1315 (7th Cir. 1989) for the fact that one week between complaint and adverse action is sufficient to create factual issue on causation).

Further, around the time of Motley's grievance and charge, TSC vice president Goldberg gave Motley his direct phone number, and instructed him to call if there were any future incidents of "harassment" by Pompey. Fed.Dep. at 135–37, 409. Goldberg told him the company would not tolerate such conduct. *Id.* At the time this occurred, Goldberg was unaware that Motley had filed a charge with the ICRC. Once Goldberg learned that Motley had already filed a charge of discrimination he was upset. Fed.Dep. at 136. He confronted Motley and was angry, stating that it was because Motley had not given him a chance to fix the problem before he went to the ICRC. Fed. Dep. at 136–37; 409. TSC has provided no evidence about this incident or about whether it was part of its standard procedures for dealing with complaints such as Motley's.

Such behavior by a corporate vice president, however, can send a powerful message against filing charges of discrimination. Motley is entitled to the inference that Goldberg was angry because of the charge. At the very least, Goldberg's angry outburst would have reduced the likelihood that Motley would call him in the future to report any other problems.

Subsequently, Goldberg commented that Motley had potential, and asked him if he were interested in a management position. Motley interpreted this comment as a bribe to get him to drop his civil rights complaints. When Motley turned him down, Goldberg said, "That's the problem with your black ass.... Can't do nothing for you." Fed.Dep. at 133–34. This occurred in late 1993 or early 1994, after Motley had returned from his "stress leave" following the charge. *Id.* at 133. Although TSC management was "looking for black supervisors," Motley Aff. ¶ 10; Fed.Dep. at 319, Motley seems to have been approached for a different reason. A reasonable inference is that it was related to the charge, either as an effort to get rid of a trouble-maker, or to induce him to drop the issue. Moreover, Goldberg suggested that Motley would have a better chance of becoming a supervisor if he followed in Pompey's footsteps, which is an ambiguous comment considering that Motley had just filed a charge of discrimination against TSC because of Pompey's conduct. Motley interpreted Goldberg's comment as meaning he should hassle other blacks. Motley Aff. ¶ 17. It could also mean he could be promoted if he would stop hassling his employer, such as by filing a charge of discrimination.

Pompey echoed this sentiment when he told Motley that if he wanted to become a supervisor he would have to be "more like me." Fed.Dep. at 319. Motley took statements like these as bribes to get him to drop his discrimination complaint. Although ambiguous, Goldberg's comments, if made as Motley asserts in connection with Motley abandoning his complaint, suggest a retaliatory motive. For purposes of this analysis, it is enough that TSC has offered no evidence to dispute or explain any of these statements. Motley testified that Pompey and Goldberg's

statements were made in retaliation and as harassment for his having filed a charge. A reasonable juror could find that he was right. This evidence suffices to create an issue of fact about TSC's motives for suggesting a management position to Motley.

Motley also testified that he was subjected to harassment by his direct supervisor, Kerulis, after the charge, and that he was not allowed to return to his former shift. Motley Aff. ¶¶ 13, 17. Specifically, when Motley returned from a stress leave of absence in November of 1993, he asked to be returned to his former shift as a picker. Motley Aff. ¶ 19. Kerulis, who was authorized to assign Motley to a shift, denied the request. *Id.* According to Motley, the reason he was given was that Kerulis wanted to keep Motley and Pryner apart, and during the conversation Kerulis allegedly used a racial slur when referring to the two black employees who had filed charges of discrimination. *Id.* Kerulis reportedly used this same racial slur with reference to Motley, when he told another worker he was going to "have to get rid of that nigger." Bonebrake Dep. at 60. The implication is that Kerulis considered Motley a "troublemaker." Again, TSC has offered no evidence to contradict Motley's version of this event, nor has it pointed the Court to any evidence in the record that would call its accuracy into doubt or explain Kerulis' action. Consequently, a genuine issue of material fact exists as to whether Motley was denied permission to return to his former shift because he had filed a charge of discrimination.

According to Motley, Goldberg, who "was aware of this increased pattern of racial discrimination," took Pompey "under his wing and made him invulnerable to any complaints that [Motley] would make." Motley Aff. ¶ 17. This allegation is consistent with the fact that TSC has offered no evidence that it conducted an investigation into the allegations against Pompey. Rather, TSC appears to have sat "on its hands in the face of the campaign of [supervisory] harassment" about which it knew no later than May 10, 1993, when Motley filed a second ICRC charge claiming his employer was retaliating against him because of his first charge. *See Knox*, 93 F.3d at 1334–35 (finding retaliation in employer's lack of response to and acquiescence in co-workers' campaign of harassment and rumor-mongering). Motley provided additional notice of retaliatory harassment in his January 10, 1994, grievance filed with the Union. Paxton I Aff., Ex. 1(d). In it, Motley claimed that he had been harassed because he "filed civil rights on the company," and he mentioned the fact that when he returned from leave he did not get the shift on which he had bid. *Id.* He also stated that the manager "Ron" was threatening to suspend him for something that was a "management oversight," and not his fault. *Id.* Motley felt that it "was an attempt to make [him] quit," and he thought Goldberg may have told Ron to impose some sort of discipline on him. *Id.*

The January 1994 grievance also suggests that some people in the Distribution Center had been labeling Motley and Pryner "troublemakers," and had expressed a desire to get rid of them. *Id.* It also mentioned that Kerulis told Motley that he could not return to the same shift as Pryner because management wanted to keep these two workers separated. *Id.* The commonalities between Pryner and Motley were their race and the fact that they had both filed charges of discrimination. A reasonable inference that could be drawn from these contemporaneous statements is that TSC withheld a privilege of employment (returning to work the same shift as before a leave of absence) from Motley because of his complaint. Moreover, TSC had ample notice that Motley was claiming to be suffering retaliation for his protected activity, and it has produced no evidence to show that it took any action to stop the alleged retaliatory harassment or prevent future recurrences.

In November of 1994, Motley returned from a second stress leave of absence to find that Kerulis and Pompey had been joined by another supervisor, Diedring, and the three of them began following Motley around the warehouse. Motley Aff. ¶ 20. This was after Diedring and Pompey had both expressed the desire to get rid of Motley, using a racial slur in the process. *See* Bonebrake Dep. at 60. Pompey, particularly, would drive to Motley's workplace and watch him until Motley noticed his presence, and then drive off

without saying anything. Motley Aff. ¶ 20. No evidence was offered by the defendant to contradict or explain the actions described in this testimony. Viewing the facts in the light most favorable to Motley, the alleged behavior constitutes a subtle form of supervisory intimidation, which creates a genuine issue of material fact about whether it was because Motley had filed a charge of discrimination.

The Court finds that Motley has provided sufficient evidence to allow a jury to conclude that he suffered a change in his workplace environment at the hand of some of his supervisors, and the change occurred in close enough proximity to the protected activity to justify the inference that it was in retaliation for his filing a charge of discrimination. Likewise, Motley has demonstrated that he was targeted by other supervisors, against whom he had not previously complained, after the charge was filed. As in *Knox,* the facts viewed in the light most favorable to the plaintiff support a finding of an adverse employment action in the form of ignoring new and intensified supervisory harassment for invoking his rights under Title VII.[16] *See Knox,* 93 F.3d at 1334–35. There is also enough evidence to support the inference that this different treatment of Motley was "not wholly unrelated" to his having filed the two charges of discrimination. Thus, Motley has satisfied the elements of his prima facie case, and shifted the burden of production to the defendant.

However, TSC has provided no evidence to explain the different treatment Motley received. Instead, the defendant has focused almost all of its briefing on the issue of whether Motley was discharged for a discriminatory purpose. Thus, TSC has failed to meet its simple burden of production on the issue of whether Motley suffered retaliation by means of a ratcheting up of the harassment or hostility in his work environment. While it may not have been enough to prove Motley was terminated because of his protected activity, the increased animosity and hostility directed towards Motley after the 1993 charge of discrimination certainly suggest that he was being retaliated against. This claim survives the summary judgment motion.

Shortly after he filed his grievance and his charge, Motley went on a stress leave of absence that lasted for more than six months. He took another stress leave in 1994. Motley also stated that he had begun to take his frustrations out on his kids, and in June of 1995, he came to blows with a co-worker. Although he cannot directly relate any harassment he suffered after he filed his charge of discrimination to his ultimate discharge, Motley claims that it contributed to his attendance problems, which problems ultimately caused his termination. The Court finds that Motley has presented sufficient evidence to create an issue of fact about whether he suffered actual harm as a result of the alleged retaliation, entitling him to present to the jury any evidence he has to support the extent of his damage.

■ One final point is worth making. It is possible that Pompey was particularly upset with Motley and Pryner because they were black and had filed a grievance and charge of discrimination. According to Motley, some of the supervisors to whom he had reported Pompey's prior conduct suggested that it was not possible for one black to racially harass another. This is not true. *See Hansborough v. City of Elkhart Parks & Rec. Dept.,* 802 F.Supp. 199, 201–06 (N.D.Ind.1992) (providing a thorough analysis of intra-racial discrimination.); *see also United States v. Crosby,* 59 F.3d 1133, 1135, n. 4 (11th Cir.1995) (noting that a Title VII violation may occur even when supervisor or decision-maker is same race as alleged victim); *Dungee v. Northeast Foods, Inc.,* 940 F.Supp. 682, 688 (D.N.J.1996) (evidence of decision-maker's membership in protected group is not dispositive of whether discrimi-

---

16. Although the issue was not raised by TSC, another factor to determine with respect to retaliation claims is whether the alleged retaliatory adverse employment action may be viewed as material. *See Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 885 (7th Cir.1998). Motley has provided enough evidence to create a factual issue about whether the actions taken against him were material. For instance, he claims that the constant harassment contributed to his attendance problems, because he could not tolerate being in the workplace. If found to be true, that would certainly constitute a materially adverse employment action, because those problems caused his ultimate discharge.

nation occurred); *Ecklund v. Fuisz Tech., Ltd.*, 905 F.Supp. 335, 338 E.D.Va.1995) (regarding same sex discrimination); *see also, Rodriguez v. Gattuso*, 795 F.Supp. 860 (N.D.Ill.1992) (being of the same race as defendant did not prevent plaintiff in a housing discrimination action from claiming discrimination on the basis of color).

The Supreme Court began, in 1986, the gradual process of paving the way for courts to find it possible that one of two people considered to be of the same race, could violate Title VII or § 1981, by discriminating against the other.[17] *See Saint Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) (holding that Congress intended § 1981 "to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics."). A distinctive physiognomy is not essential to qualify for protection. *Id.* This is because "genetically homogeneous populations do not exist and traits are not discontinuous between populations," which means populations, or classes, can only be described in terms of "relative frequencies of various traits." *Id.* at 610 n. 4, 107 S.Ct. 2022.

In fact, as the *Hansborough* court noted, "it would take an ethnocentric and naive world view to suggest that we can divide Caucasians into many sub-groups but somehow all blacks are part of the same subgroup." 802 F.Supp. at 206 (quoting *Walker v. Secretary of Treasury*, 713 F.Supp. 403, 407 (N.D.Ga.1989)). Although Motley himself provided the evidence to suggest that Pompey was not targeting him because of his race, it is possible that, in the absence of any such admission, Pompey could have reacted negatively to Motley because of some difference between the two in terms of their coloring, physical characteristics, or other intraracial differences. To prove such discrimination, Motley would have needed to provide evidence of those types of differences between the two. Because he did not, and the evidence demonstrates that Pompey's ani-

mosity towards Motley, prior to the charge of discrimination, was based in part on personality differences, or differences in their relative positions in the workplace, this issue is not in dispute. Therefore, Motley may only ask the fact-finder to determine whether Pompey retaliated against him for filing his charge.

While it may appear incongruous that there could be no factual issue regarding Motley's firing, yet one could exist as to whether he suffered retaliation, no anomoly has occurred. To the casual observer, it would seem logical that if a person is fired for lack of attendance, he or she is prohibited from claiming that he or she suffered retaliation for protected activity immediately prior to the termination. Yet that is not the case, as the parties have discovered here. Merely because an employee who claims to be the victim of retaliation subsequently violates a written company policy and is discharged, does not mean that any unlawful treatment his employer directed at him between the time of his protected activity and the time he is discharged is automatically erased.

When monitoring the activities of a recalcitrant employee, even one who has filed a charge of discrimination, it is acceptable for the employer to monitor attendance, or insubordinate behavior, or other objective conduct. However, it is not acceptable for the employer to engage in the type of conduct described here that a jury could find to be retaliatory. In sum, conduct that could be considered retaliatory, even though the employee was ultimately discharged for a legitimate reason, includes, but is not limited to, issuing a written reprimand for conduct that ordinarily would receive only an oral warning, failure to make an independent investigation of an employee's allegations of racial harassment by his supervisor, angry name calling by a supervisor, angrily chastising an employee for filing a charge of discrimination, refusing to investigate a supervisor who is accused of discrimination and then using him as an example for the harassed employee to follow if he wants a promotion, refusing to

**17.** It has arguably furthered the process by deciding this year that same-sex sexual harassment is possible and actionable under Title VII, if the criteria of the law are met. *See Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998) (nothing in Title VII necessarily bars claim of discrimination "because of ... sex" merely because the plaintiff and person charged with acting on behalf of the defendant are of the same sex).

reinstate the harassed employee to his former shift upon his return from leave (for the professed reason of keeping him and another employee in the protected class apart), expressions of the desire to get rid of the employee who has filed a charge of discrimination, calling employees who have filed a charge of discrimination trouble-makers, and excessive monitoring of the employee who filed a charge of discrimination. It is this lesson the Court hopes will be learned from this case.

## CONCLUSION

The Court has found that Motley failed to present sufficient evidence from which a trier of fact could find that he was the victim of race discrimination prior to his charge of discrimination filed in April of 1993. Nor is there sufficient evidence to overcome the defendant's reasonable explanation for Motley's discharge in July of 1995. For these reasons, the Court **GRANTS** summary judgment for defendant TSC on the claims of racial harassment, and discriminatory discharge on the basis of race or retaliation.

However, sufficient evidence has been presented of a deterioration in Motley's workplace environment following his 1993 charge of discrimination, such that his claim of retaliatory harassment survives the motion for summary judgment. Thus, TSC's motion for summary judgment is **DENIED** with respect to the claim of retaliation in the form of harassment.