# FOR PUBLICATION



FILED
Dec 02 2014, 10:13 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**PATRICK F. O'LEARY**
Goshen, Indiana

ATTORNEYS FOR APPELLEE:

**PETER J. AGOSTINO**
Anderson Agostino & Keller P.C.
South Bend, Indiana

**M. CATHERINE FANELLO**
Krieg DeVault LLP
Mishawaka, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

BEVERLY S. STILLSON,      )
                          )
    Appellant-Plaintiff,  )
                          )
    vs.                   )      No. 20A03-1406-CT-191
                          )
ST. JOSEPH COUNTY         )
HEALTH DEPARTMENT,        )
                          )
    Appellee-Defendant.   )

APPEAL FROM THE ELKHART SUPERIOR COURT
The Honorable Evan S. Roberts, Judge
Cause No. 20D01-1303-CT-41

**December 2, 2014**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Beverly Stillson appeals the trial court's grant of summary judgment in favor of St. Joseph County Health Department ("SJHD") on Stillson's complaint alleging retaliatory discharge. Stillson presents a single issue for our review, namely, whether there are genuine issues of material fact that preclude summary judgment.

We reverse and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

In March 2011, SJHD re-opened a clinic to treat patients with sexually-transmitted diseases ("the clinic"). Stillson and Courtney Dewart, both registered nurses employed by SJHD, were chosen to staff the clinic. Dr. Thomas Felger, M.D., the Health Officer for SJHD, worked at the clinic approximately sixteen hours per week. Dr. Felger was the only physician working at the clinic. Stillson and Dewart reported to Barbara Baker, R.N., the Director of Nursing for SJHD, and Baker reported to Dr. Felger. Other than on one day in June 2011, Dr. Felger did not see patients at the clinic. Stillson and Dewart saw patients and administered treatments based upon the 1998 Centers for Disease Control ("CDC") Guidelines for Treatment of Sexually Transmitted Diseases ("the 1998 Guidelines"). The 1998 Guidelines "provide[d] the protocols for the treatment of various STD[s], including syphilis, in the St. Joseph County Health Department." Appellee's App. at 4.

In approximately June 2011, Stillson and Dewart became concerned that the protocols for treating patients at the clinic required them to exceed the scope of practice for a registered nurse. Stillson and Dewart shared those concerns with Baker and Dr.

2

Felger. And on June 22, Stillson contacted the Indiana State Board of Nursing by email as follows:

> I am asking for some clarification regarding "scope of practice" of a registered nurse working in an STD clinic in a local health department in the state of IN.
>
> When a client presents at our clinic with symptoms of Gonorrhea or Chlamydia, we have been urine testing them and if that test is positive, treating them per CDC protocol by RN. If a client presents at clinic stating that his sexual partner has had a positive lab test for GC or CT[1], we are asking for a copy of that laboratory report and if presented, that client will be treated per CDC protocol by RN.
>
> Question is—when client presents without support of positive partner lab, is it outside the scope of practice of RN to treat that person with antibiotics? There is no nurse practitioner or physician overseeing each client to make diagnosis.
>
> Do "Public Health" RN's have different scope of practice?—Are RNs in Public Health setting able to diagnose disease and treat an STD on a client's word of exposure or stated symptoms without oversight by NP or physician?

Appellant's App. at 110.

In response to Stillson's email, Lori Grice, Assistant Director of the Indiana State Board of Nursing, wrote to Stillson as follows:

> The Indiana State Board of Nursing nurse practice act does not define nursing scope of practice in terms of specific procedures. . . .
>
> The nurse cannot perform or delegate those duties that are specifically reserved for other licensed individuals, and that they [sic] maintain responsibility for the safe and appropriate performance of any nursing measure that they delegate. If a nurse does not feel comfortable delegating tasks permitted or required by their employer's policy or practice, there is a decision to be made: document it, and do not allow yourself to be placed in a position where you are forced to practice

---

[1] We discern from the context that "GC" stands for Gonorrhea and "CT" stands for Chlamydia.

unsafely, because ultimately it is an individual's license to practice that is at stake here.

Id.

On June 24, Baker and Dr. Felger prepared the following "Conference Record" regarding an incident that day:

On June 24, 2011, Dr. Felger was in the STD clinic to observe clinic operations and see clients as necessary.[2] Dr. Felger was present during a client interview. The client stated his partner had told him he had an STD possibly Chlamydia but there was no lab report of the partner named to confirm the client exposure.

Clinic practice has been to treat partners when a positive lab of the diagnosed partner lab can be obtained. In the absence of a lab report testing of the partner presenting is done and treatment initiated upon confirmation of the STD diagnosis.

Dr. Felger decided as the attending physician to treat this client based on his statement of exposure. Beverly Stillson felt that this was outside the realm of our established clinical practice and was uncomfortable giving the ordered medication and declined to administer. The director of Nursing intervened and requested the client be tested and have specimen sent to the lab for testing and gave the ordered oral medication to the patient prior to the client leaving the clinic.

Clinical practice in the STD clinic follows the CDC 2010 guidelines for the treatment of STD[s]. However, the attending physician always can use their [sic] clinical judgment in decisions how to best treat each individual client.

There may be times when differences in opinion as to optimal treatment or policy seem to be in conflict. Open discussion is critical but the overriding factor is the determination of the physician as to the medication order and treatment for a client.

It is essential that if a physician order for a medication is given it be administered unless there is the potential for significant harm to the client. This was not the concern in this case. The order could have been written as a verbal order on the chart or Dr. Felger could have been asked to write an order for the medication.

---

[2] The undisputed designated evidence shows that this was the only day during Stillson's tenure at the clinic when Dr. Felger saw patients face to face.

4

Registered Nurses work under the direction of the attending physician. Communication and positive working relationships are critical as part of a core health care team.

The incident reflects a breakdown in communication and clear understanding of STD policies that can be seen as policy rather than guidelines for decision making. Beverly is also new in her role in the STD clinic and is working in a clinic that has not been fully operational until the past three months.

I do not anticipate any further concerns in the working relationship with our Health Officer. A positive outcome of the meeting is the recognition of the need to meet on a regular basis with the Health Officer and STD nursing staff to address clinic operations and concerns that affect client care and overall clinic operations.

Id. at 111 (emphases added). In addition to the written reprimand, Dr. Felger told Stillson, "I don't want to hear any more about your nursing license." Id. at 108.

In July 2011, after the Indiana State Department of Health "recogni[zed]" the 2010 CDC Guidelines for Treatment of Sexually Transmitted Diseases, the clinic revised some of its policies regarding the protocols for treating STDs. Appellee's App. at 4. Effective July 11, 2011, SJHD's policy provided in relevant part that diagnoses of gonorrhea and chlamydia would be made "[b]ased on a positive [urine test] or positive lab from other health care provider[.]" Id. at 10, 11. Further, a patient presenting with "documentation of positive partner lab or patient stated history of exposure" would be treated for gonorrhea or chlamydia. Id. But the diagnosis of syphilis required a "clinical decision and laboratory diagnosis" by the attending physician "prior to the administration of Penicillin." Id. at 15 (emphasis added).

On July 19, Dewart contacted a former nursing professor by email and wrote the following:

5

Currently, I am working part-time in the STD clinic. At present, a fellow RN and myself have been operating under a policy signed by a health officer, that says that STD clinic staff shall use the CDC Treatment Guidelines to treat patients (based upon a positive lab result). Regarding treatment of partners, a policy outlines that partners can be treated with proof of a positive partner lab. This practice of presumptive treatment of contacts of someone diagnosed with an STD is endorsed by the CDC in the most current 2010 Treatment Guidelines.

Last week, however, we were blindsided by a new policy, with wording related to presumptive treatment that I can find no evidence that the CDC supports, and that I feel far exceeds the scope of practice of an RN. The new policy says to treat "with documentation of positive partner lab or PATIENT STATED HISTORY OF EXPOSURE." This last part is what has me concerned: a client can walk in, state that they think they have been exposed to a specific STD, but with no lab, no partner lab, and prior to any testing, the RN is expected to provide treatment.

In my opinion, this falls outside of an RN's scope of practice, even if the Health Officer (an MD) signs off on the policy for this reason: in order to warrant treatment, there must be a diagnosis. Even if it is only the diagnosis or positive lab of a partner, the CDC endorses treating in that situation. But in this case, where is the diagnosis? Who is diagnosing or validating the said disease? The patient can't self-diagnose, so it would seem that it would be the RN that would have to make the specific diagnosis (based off of patient's word) in order to provide a specific treatment.

I was so uncomfortable with this new policy, as was a fellow RN that works in the STD clinic with me. We approached management and explained that in these rare instances, we would be happy to treat if the Health Officer would give a verbal order to treat. He has so far refused to do this. So, myself and fellow RN simply refused to accept the new policy with this wording on presumptive treatment, and requested that we be moved into two available "Public Health Nurse" positions that would relieve us of STD clinic duties. In essence, we were told that this may not be possible, and that we may have to be let go if we refuse to follow the policy as written.

Whew! A bit of a bad situation, but, as I told my boss: even though I absolutely love my job, if I feel like something falls outside of my scope of practice as a Registered Nurse, I will not do it, even if that means losing my job.

Id. at 60 (emphases added).

Thereafter, Stillson and Dewart contacted Queenie Evans, the Human Resources Director for SJHD, regarding their concerns about the new protocols. And on July 26, Evans wrote the following email to Stillson and Dewart:

> Last evening I had the opportunity to discuss your issue with attorney Peter Agostino. After he reviewed the policy and the CDC regulations he advised me that the doctor followed the regulations and the policy being signed by Dr. Felger makes it a standing order. Peter also stated that waiting to treat a possible infected individual could cause more problems down the line. As that person in the interim could go out and infect more people while he waits for the test results. It is better to be safe than sorry. So the doctor's policy is a legal document and he is not asking you to perform duties outside of your scope of practice.
>
> Also per your policy manual you have the right to have a witness present during a meeting or reprimand.
>
> It is now time to move past this issue and move forward. I know this has been a distracting issue but hopefully I have been able to put your minds at ease.
>
> Have a wonderful week.

Appellee's App. at 111-12 (emphasis added). In response, Stillson wrote the following email to Evans:

> Thank you so much, Queenie.
>
> Really appreciate your and Mr. Agostino's time in this matter. Would it be possible to obtain this explanation in writing signed by Mr. Agostino for Courtney and my personnel and personal file? I think we will be able to proceed now with good care of our clients in STD clinic.
>
> Also, will these policies be signed by legal counsel? Just trying to understand the legal workings!!
>
> Again, thank you!!

Id. at 111. In response to Stillson's email, on August 3, Agostino prepared a memorandum addressing the following issue: "Whether treatment by registered nurses in accordance with the 2010 CDC Sexually Transmitted Diseases Treatment Guidelines . . . of Chlamydia, Gonorrhea, Trichomoniasis, and Syphilis without a formal lab test being performed is a violation of the Indiana Code and/or Indiana Administrative Code." Appellee's App. at 113. The memorandum provided as follows:

We were provided with the St. Joseph County Health Department Policy and Procedure relative to the treatment of recommendations for Chlamydia, Gonorrhea, and Syphilis which went into effect on 07/07/11, as well as a revised policy and procedure which was drafted by the nurses who are charged with carrying out the policies and procedures. The changes that the nurses made require that testing for the diseases to be treated be performed prior to the treatment of the diseases. The nurses' concern likely stems from 848 IAC 2-2-1 through 2-2-3, as well as Indiana Code [Section] 25-23-1-1.1, as a nurse is not authorized to engage in the diagnosis of a disease and thereafter treat the disease without the intervention of a physician with an unlimited license to practice medicine or orthopedic osteopathic medicine, a licensed dentist, a licensed chiropractor, a licensed optometrist or a licensed podiatrist.

Pursuant to Indiana Code [Section] 25-23-1-1.1 (b)(5), nurses are charged with "executing regimens delegated by a physician. . . ." Due to the fact that the policies and procedures at issue were put in place by and signed by a physician these policies and procedures can be considered a standing order to be executed by nurses. Since nurses are responsible to "formulate a nursing diagnosis based on accessible, communicable, and recorded data which is collected in a systematic and continuous manner," and assess patients in a systematic and organized manner pursuant to 848 IAC 2-2-1, nurses are authorized to assess a patient and carry out a physician order if the patient meets the physician's criteria to be treated. In this instance, the policy and procedure put into place by the St. Joseph County Health Department gives specific directions on what the nurses must look for prior to treating the diseases mentioned above when performing their nursing diagnoses. Thus, any treatment of the aforementioned diseases by the nurses pursuant to the policies and procedures would be akin to a nurse in a hospital setting administering a drug to an in-patient based on a nursing diagnosis pursuant to a standing order to administer the drug.

8

In our professional opinion, <u>nurses performing the duties as directed by the Medical Director of St. Joseph County Health Department is not a violation of the nursing laws and regulations</u>.

<u>Id.</u> at 113-14 (emphases added).

On August 17, Stillson saw a syphilis patient, and Stillson contacted Baker and requested that Dr. Felger "stage" the disease. "Staging" is a determination, by a physician, of whether a patient's syphilis is primary or secondary, which, in turn, dictates what treatment should be administered.[3] Appellant's App. at 37-38. Baker refused to contact Dr. Felger on Stillson's behalf and instructed Stillson to administer a single shot of penicillin "on the <u>assumption</u> that the patient's syphilis was 'primary' and not 'latent.'" <u>Id.</u> at 108 (emphasis added). Stillson refused to administer the shot of penicillin "without a medical diagnosis." <u>Id.</u> Stillson asked that Dr. Felger "participate in the assessment [of the patient] by telephone." <u>Id.</u> Again, Baker refused Stillson's request.

> Thereafter, Baker
>
> determined that Stillson's employment with [SJHD] was in jeopardy due to her unprofessional behavior [on August 17]. . . . Her behavior continued to deteriorate subsequent to this discussion. Termination was considered but, instead, as a condition of employment, Stillson was mandated to participate in the Employee Assistance Program.

<u>Id.</u> at 89. And on August 30, 2011, Baker gave Stillson an "eight month review of her performance[,]" which was deemed

> unsatisfactory because [Stillson] had difficulty dealing with peers and management, excessive absences, lack of respect for others with different

---

[3] Treatment of primary and secondary syphilis, or syphilis that has been "latent less than one year," consists of a single dose of Penicillin. Appellee's App. at 15. Treatment of "late latent syphilis or latent syphilis of unknown duration or greater than one year" consists of three doses of Penicillin at one week intervals. <u>Id.</u>

9

perspectives, her negative tone and body language at various times, inability to follow chain of command, inability to properly address peers and leadership when addressing concerns, and failure to follow policies related to patient care.

Id. But, in a quarterly report prepared for the Indiana State Nurses Assistance Program ("ISNAP") on January 6, 2012, Baker stated that Stillson was "working well [with] clients and peers[; was] professional in interactions with managers and medical director[; and was] open to others' ideas or suggestions." Appellant's App. at 116.

On approximately March 2, 2012, Stillson "attacked [a fellow nurse's] work habits in front of several other fellow employees."[4] Appellee's App. at 89. That incident was reported to Baker. And on March 9, when Baker discussed with Stillson "her overuse of flex time[,]" Stillson "became loud, aggressive and somewhat threatening." Id. Accordingly, on March 9, Baker met with Paige Smith, the Assistant Director of Nursing, and Nick Molchan, the Administrator for SJHD, to discuss Stillson's "most recent behavior." Id. Baker, Smith, and Molchan decided to talk to Dr. Felger about whether to terminate Stillson's employment. And, after a meeting, Dr. Felger agreed that SJHD should terminate Stillson's employment. Accordingly, in a written notice of termination dated March 12 and given to Stillson that day, Baker and Dr. Felger stated the following:

Concerns exist about Beverly's attitude toward peers and management is [sic] becoming increasingly hostile and aggressive.

She has a complete book of human resource policies and this is not the first time discussions have been held with Beverly about flex time accruals. She has an excessive need for wanting written documentation on every work flow process instead of using critical nursing judgment.

---

[4] Stillson accused the coworker of spending too much time on personal phone calls during work hours.

10

There have been four other conference records with Beverly in the past year. She was also mandated to go through the Employee Assistance Program as a condition of continued employment in August 2011.

Continued employment at the health department is not in the best interest of Beverly or the department. Termination is effective immediately.

Id. at 108 (emphasis added).

On September 11, 2013, Stillson filed an amended complaint[5] alleging that

[SJHD] fired [Stillson] in retaliation for her refusal to exceed her scope of practice; for her refusal to violate nursing regulations; for notifying in writing [SJHD] and the [Indiana State Board of Nursing] [sic]; and for her refusal to commit a crime or unprofessional conduct for which she was subject to possible criminal prosecution or professional discipline up to and including the revocation or suspension of her RN license.

Appellant's App. at 15. SJHD filed its answer and, on February 21, 2014, SJHD moved for summary judgment. The trial court granted SJHD's summary judgment motion following a hearing. This appeal ensued.

## DISCUSSION AND DECISION

Our supreme court recently reaffirmed our standard of review in summary judgment appeals:

We review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Williams v. Tharp, 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." Id. (internal citations omitted).

---

[5] Neither the briefs nor the record on appeal indicates when Stillson filed her original complaint or why it was amended.

11

The initial burden is on the summary-judgment movant to "demonstrate[] the absence of any genuine issue of fact as to a determinative issue," at which point the burden shifts to the non-movant to "come forward with contrary evidence" showing an issue for the trier of fact. Id. at 761-62 (internal quotation marks and substitution omitted). And "[a]lthough the non-moving party has the burden on appeal of persuading us that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that he was not improperly denied his day in court." McSwane v. Bloomington Hosp. & Healthcare Sys., 916 N.E.2d 906, 909-10 (Ind. 2009) (internal quotation marks omitted).

Hughley v. State, 15 N.E.3d 1000, 1003 (Ind. 2014) (alterations original to Hughley).

We emphasize that summary judgment is a "high bar" for the moving party to clear in Indiana. Id. at 1004. "In particular, while federal practice permits the moving party to merely show that the party carrying the burden of proof [at trial] lacks evidence on a necessary element, we impose a more onerous burden: to affirmatively 'negate an opponent's claim.'" Id. at 1003 (quoting Jarboe v. Landmark Comm. Newspapers of Ind., Inc., 644 N.E.2d 118, 123 (Ind. 1994)). Further:

Summary judgment is a desirable tool to allow the trial court to dispose of cases where only legal issues exist. But it is also a "blunt . . . instrument" by which the non-prevailing party is prevented from having his day in court. We have therefore cautioned that summary judgment is not a summary trial and the Court of Appeals has often rightly observed that it is not appropriate merely because the non-movant appears unlikely to prevail at trial. In essence, Indiana consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims.

Id. at 1003-04 (citations and some quotations omitted; omission original to Hughley).

Stillson contends that SJHD fired her in retaliation for her refusal to engage in the unlicensed practice of medicine and her refusal to violate Board of Nursing regulations. In particular, on appeal, Stillson suggests that SJHD had asked her to stage syphilis, and

12

she alleges that "[i]t would be a crime for a registered nurse to engage in this conduct."

Appellant's Br. at 15. SJHD maintains that the trial court properly granted its summary judgment motion because the designated evidence shows that it fired Stillson for non-retaliatory reasons.

In Powdertech, Inc. v. Joganic, 776 N.E.2d 1251, 1261-62 (Ind. Ct. App. 2002), this court set out the applicable law as follows:

> In general, an employment contract of indefinite duration is presumptively terminable at the will of either party. Pepkowski v. Life of Ind. Ins. Co., 535 N.E.2d 1164, 1168 (Ind. 1989). However, in Frampton v. Central Ind. Gas Co., 260 Ind. 249, 297 N.E.2d 425 (1973), our supreme court created an exception to the employment-at-will doctrine when an employee was discharged for filing a worker's compensation claim. The Frampton court stated that when an employee is discharged solely for exercising a statutorily conferred right, an exception to the general rule is recognized, and a cause of action exists in the employee as a result of the retaliatory discharge. Id. at 253, 297 N.E.2d at 428. We have acknowledged that:
>
> > one of the reasons for the Frampton rule is to prevent the employer from terminating the employment of one employee in a manner which sends a message to other employees that they will lose their job if they exercise . . . [a statutorily conferred right]. . . . The discharge of an employee merely for suggesting she might . . . [exercise a statutorily conferred right] has an even stronger deleterious effect.
>
> Samm v. Great Dane Trailers, 715 N.E.2d 420, 426 (Ind. Ct. App. 1999), abrogated on other grounds by Martin v. State, 774 N.E.2d 43 (2002) (internal quotations omitted).
>
> The question of retaliatory motive for a discharge is a question for the trier of fact. Dale v. J.G. Bowers, Inc., 709 N.E.2d 366, 369 (Ind. Ct. App. 1999). "Where causation or retaliation is at issue, summary judgment is only appropriate 'when the evidence is such that no reasonable trier of fact could conclude that a discharge was caused by a prohibited retaliation.'" Markley Enter., Inc. v. Grover, 716 N.E.2d 559, 565 (Ind. Ct. App. 1999) (quoting Hamann v. Gates Chevrolet Inc., 910 F.2d 1417, 1420 (7th Cir. 1990), reh'g denied ). . . . In cases of wrongful termination based

upon allegations of discrimination, the employee can prove pretext [at trial] by showing that: (1) the employer's stated reason has no basis in fact; (2) although based on fact, the stated reason was not the actual reason for discharge; or (3) the stated reason was insufficient to warrant the discharge. Dale, 709 N.E.2d at 369 (citing Motley v. Tractor Supply Co., 32 F. Supp. 2d 1026 (S.D. Ind. 1998)).

(Emphases added). And in McClanahan v. Remington Freight Lines, Inc., 517 N.E.2d 390, 392 (Ind. 1988), our supreme court extended the Frampton rule and held that an employee cannot be discharged solely for refusing to breach a statutorily imposed duty.

Here, Stillson contends that SJHD fired her for refusing to breach a statutorily imposed duty, that is, practicing within the scope of her license as a nurse as set out in Indiana statutes and the Indiana Administrative Code. In its summary judgment motion, SJHD designated as evidence Dr. Felger's affidavit stating that SJHD never asked Stillson to stage syphilis or "do anything unlawful." Appellee's App. at 5. SJHD also designated as evidence the March 12, 2012, notice of termination showing that it had valid, non-retaliatory reasons for terminating Stillson's employment. Thus, SJHD affirmatively negated Stillson's claim of retaliatory discharge. The burden then shifted to Stillson to designate evidence to make a prima facie showing that SJHD had asked her to exceed the scope of her practice as a nurse in violation of Indiana statutes or the IAC. And Stillson had to designate evidence to establish a question of fact regarding SJHD's motive for her discharge.

According to 848 IAC 2-2-2: "The registered nurse shall . . . [f]unction within the legal boundaries of nursing practice based on the knowledge of statutes and rules governing nursing." And 848 IAC 2-2-3 provides in relevant part:

14

Nursing behaviors (acts, knowledge, and practices) failing to meet the minimal standards of acceptable and prevailing nursing practice, which could jeopardize the health, safety, and welfare of the public, shall constitute unprofessional conduct. These behaviors shall include, but are not limited to, the following:

(1) Using unsafe judgment, technical skills, or inappropriate interpersonal behaviors in providing nursing care.

(2) Performing any nursing technique or procedure for which the nurse is unprepared by education or experience. . . .

Further, Indiana Code Section 25-22.5-8-1 provides in relevant part that it is unlawful for any person to practice medicine in this state without holding a license or permit to do so. And Indiana Code Section 25-22.5-8-2 provides in relevant part that a person who knowingly or intentionally violates this article by unlawfully practicing medicine commits a Class C felony. The undisputed designated evidence establishes that only a licensed physician can make a medical diagnosis. And the undisputed designated evidence shows that only a licensed physician can stage syphilis, and once staged, the protocols direct the treatment.

In opposition to summary judgment, Stillson designated as evidence her affidavit, which provides in relevant part as follows:

8. On August 17, 2011, a Syphilis patient visited the clinic. I contacted [Director of Nursing] Baker to involve Dr. Felger in staging the disease. Ms. Baker refused to involve him. <u>She instructed me to administer a single shot of penicillin on the assumption that the patient's Syphilis was "primary" and not "latent." I refused to do so, without a medical diagnosis</u>.

I even suggested that Dr. Felger participate in the assessment by telephone. Verbal orders are commonly given by physicians, for obvious reasons. The nurse makes a notation on the patient's charge documenting the date, time, and specifics of the physician's order. Later, the physician pulls the patient's chart and signs his or her initials beside the nurse's chart notation. Ms. Baker refused my request for Dr. Felger's verbal order. <u>This</u>

15

incident led to the issuance of a disciplinary write up that is attached as Exhibit 4. The handwritten notations on the document are mine. They refer to my request that Dr. Felger make the diagnosis and issue a verbal order, which Ms. Baker refused.

Id. at 108 (emphases added). Exhibit 4 to Stillson's affidavit provides as follows:

Concern: Communication and Interaction with Director of Nursing and Assistant Director of Nursing

On Wednesday August 17, 2011[,] the director of Nursing spoke with STD nursing staff regarding a client who needed medical treatment the following day. The treatment recommendation was through conversations with the Indiana State Department of Health, the Health officer and the Director of Nursing.

Beverly did not feel treatment should occur without a direct written order from the physician and a clear definition of the diagnosis. When I tried to explain to her the diagnosis at this time was going to be treated as a primary case pending further determination she remained convinced that what was being told to her was not sufficient to treat.

She became increasingly vocal and I told her she was wrong in her view. She became even more upset and left the clinic area but apparently stopped at the Assistant Director of Nursing's office to voice her anger and used inappropriate language to the ADON. This incident reflects unacceptable behavior and lack of respect for management. Clinical practice in the STD clinic follows the CDC 2010 guidelines for the treatment of how to best treat each individual client.

There may be times when differences in opinion as to optimal treatment or policy seem to be in conflict. Open discussion is critical but the overriding factor is the determination of case management is not made by nursing staff.

Registered Nurses work under the direction of the Health Officer. Communication and positive working relationships are critical as part of a core health care team.

The incident reflects a breakdown in communication and clear understanding of STD policies.

This is the second incident in two months with unacceptable behavior.

> Beverly's continued employment in the health department is in <u>serious jeopardy</u>. At this time her continued employment will be based on a referral and mandatory participation in the Employee Assistance Program effective immediately.
>
> Re-evaluation of her employment status will be made upon completion of the EAP program.

<u>Id.</u> at 114 (emphases added).

We hold that Stillson designated sufficient evidence to establish a genuine issue of material fact whether SJHD had asked her to exceed the scope of her practice as a nurse in treating patients at the clinic. The undisputed designated evidence shows that a physician must stage a patient's syphilis <u>before</u> Penicillin is administered. And Stillson's designated evidence shows that she objected to administering Penicillin to a syphilis patient without a diagnosis having first been made by Dr. Felger, which would have exceeded the scope of her practice as a registered nurse.

Thus, we turn to the issue of whether Stillson has designated evidence to establish a question of fact regarding SJHD's motive for her discharge. In support of her contention on appeal, Stillson cites to <u>Markley</u>, where the plaintiff brought a claim alleging that he was terminated from his employment in retaliation for his filing a worker's compensation claim. The employer moved for summary judgment alleging that it had terminated Markley's employment because he had "made derogatory comments about the Company to a coworker in violation of Company rules." 716 N.E.2d at 562. The trial court denied the employer's summary judgment motion in relevant part, and we affirmed on appeal. We held that

> the mere fact that the Company has directed us to designated evidence in which it has articulated a reason for Grover's discharge which appears "at

17

first blush" to be independent of the worker's compensation claim does not establish, as a matter of law, that the Company lacked retaliatory intent when it discharged Grover.  See Dale v. J.G. Bowers, Inc., 709 N.E.2d 366, 370 (Ind. Ct. App. 1999).  Additional evidence designated by the Company indicates that the Company had disciplined Grover on a prior occasion for allegedly attempting to file a false claim for worker's compensation benefits.  An internal Company memo discloses an extremely hostile attitude against Grover for having attempted to file the previous claim and stated that Grover's employment would be terminated immediately in the event of "any repeat violations."  Record at 78.  Viewing that evidence in the light most favorable to Grover, a reasonable finder of fact could infer that the Company's stated reason for discharge is merely a pretext.  These facts are sufficient to raise a genuine issue of material fact as to whether the Company's true motive for terminating Grover's employment was his filing of the worker's compensation claim.  As we noted earlier, the question of retaliatory motive is a question properly for the trier of fact.  See Frampton, 297 N.E.2d at 428.  The Company is not entitled to summary judgment on this issue.

Id. at 566 (emphases added).

Stillson argues that the designated evidence in Markley is analogous to that here. In particular, on August 18, 2011, Baker and Dr. Felger prepared and signed a "Conference Record" to memorialize the incident that occurred on August 17 between Stillson and Baker regarding Stillson's refusal to treat a syphilis patient without Dr. Felger's involvement in making a diagnosis.  Appellant's App. at 114.  That Conference Record states Stillson's "continued employment in the health department is in serious jeopardy."  Id.  Stillson cites that document as proof that SJHD had previously threatened her with termination for insisting that Dr. Felger stage a syphilis patient rather than administering the treatment without a diagnosis, as instructed.

Viewing all of the evidence in the light most favorable to Stillson, a reasonable factfinder could infer that SJHD's true motive in terminating her employment was her refusal to exceed the scope of her nursing practice.  In June 2011, after Stillson refused to

treat a patient without a diagnosis, she was reprimanded, and Dr. Felger told her, "I don't want to hear any more about your nursing license." Appellant's App. at 108. In August 2011, Stillson asked Baker to contact Dr. Felger about staging a patient's syphilis, but that request was refused, and Stillson was reprimanded. Baker considered terminating Stillson at that point. In January 2012, Baker gave Stillson a positive work performance review, stating that Stillson was working well with clients and peers and was professional in her interactions with managers and the medical director. Then in March 2012, after Stillson questioned the work ethic of a coworker in front of other coworkers, and after Baker reprimanded Stillson for abusing flex time, SJHD terminated Stillson's employment. And one of the stated reasons for her termination was her "excessive need" for documentation, which included her requests for verbal orders to treat patients. Id. at 117.

The facts are sufficient to raise a genuine issue of material fact as to whether SJHD's true motive for terminating Stillson's employment was her refusal to treat patients without diagnoses being made or to otherwise exceed the scope of her nursing license. As we noted earlier, the question of retaliatory motive is a question properly for the trier of fact. See Frampton, 297 N.E.2d at 428. And, again, summary judgment is not a summary trial and it is not appropriate merely because the non-movant might appear unlikely to prevail at trial. Hughley, 15 N.E.3d at 1003-04. The trial court erred when it granted SJHD's summary judgment motion.

Reversed and remanded for further proceedings.

BAILEY, J., and PYLE, J., concur.

19